**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Christopher Jo REDDERSEN, Defendant–Appellee.**

**No. 99SA257.**

Supreme Court of Colorado, En Banc.

Feb. 7, 2000.

Sarah F. Law, District Attorney, Sixth Judicial District, Durango, CO, Attorney for Plaintiff–Appellant.

David Kaplan, Colorado State Public Defender, Frank Viehmann, Deputy State Public Defender, Durango, CO, Attorneys for Defendant–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

Pursuant to C.A.R. 4.1, the prosecution brings this interlocutory appeal from a trial court order suppressing evidence found during a search of the defendant, Christopher Jo Reddersen, and his vehicle. The trial court based the order on its determination that Reddersen's consent to search was involuntary. The trial court found Reddersen's consent involuntary because the officer asked to search him without giving him a *Miranda* advisement while he was in custody. Challenging the order to suppress, the prosecution argues that the trial court's ruling that Reddersen was in custody and that he involuntarily consented to the search was in error. We agree and hold that Reddersen was not in custody when the officer asked to search him because the officer was conducting a routine traffic stop. Routine traffic stops do not constitute custody for *Miranda* purposes as a matter of law. We further hold that the consent to search was voluntary. The trial court reasoned that the officer did not give Reddersen a *Miranda* advisement before obtaining his consent to search. The failure to give a *Miranda* advisement does not render a consent to search involuntary. Hence, we reverse.

## I.

At around 4:00 a.m. on December 30, 1998, Officer Deck Shaline of the Durango Police Department observed Reddersen driving his vehicle. Shaline had previous contact with Reddersen when Reddersen had been driving with expired license plates. Shaline suspected that the plates were still expired and

began to follow Reddersen without turning on the overhead lights or sirens of his police unit. Another police officer also followed Reddersen in a separate police unit.

Reddersen eventually parked his vehicle in front of a friend's house and got out of his vehicle. Shaline parked his police unit behind Reddersen's vehicle and approached to ask about the license plates. At approximately the same time that Reddersen acknowledged that he was driving with expired plates, dispatch confirmed that they were expired. Shaline then asked Reddersen for his driver's license. Reddersen was cooperative and gave the officer his driver's license.

Shaline radioed dispatch to check on the validity of the driver's license and to make sure that Reddersen had no outstanding warrants. While waiting for dispatch to respond, the officer kept Reddersen's driver's license. During that time, he asked Reddersen if he had any illegal substances. Reddersen responded, "I don't think so." Shaline then asked Reddersen if he could search him. Reddersen agreed and began to empty his jean pockets, placing the items on the hood of his vehicle.

Shaline asked if he could search him further, and Reddersen again agreed. The officer found a cellophane package of white rocks mixed with a white powdery substance, which he suspected was methamphetamine, in the right-hand change pocket of Reddersen's jeans.

Shaline handcuffed, arrested and placed Reddersen in the patrol car. The officer conducted a search of Reddersen's vehicle and found a glass pipe typically used to smoke methamphetamine. After taking Reddersen to the police station, Shaline advised him of his *Miranda* rights. The officer then proceeded to question Reddersen after he signed a waiver of rights form.

1. *See* §§ 18–18–204, –405, 6 C.R.S. (1999).

2. *See* § 18–18–428, 6 C.R.S. (1999).

3. The prosecution presented the following two issues for our review:
 A. Did the Trial Court err in finding that police conducted an illegal search of the defendant by

Based on the statements made at the police station and the items that the officer found during his search, Reddersen was charged with one count of unlawful possession of a schedule II controlled substance,[1] and one count of possession of drug paraphernalia.[2] Prior to trial, Reddersen moved to suppress the evidence seized during the search.

At the suppression hearing, the trial court found that Shaline subjected Reddersen to a custodial interrogation without a *Miranda* advisement when he asked to search Reddersen. Based on these findings, the trial court concluded that Reddersen's consent to the search was involuntary and suppressed the evidence seized from the search.

The prosecution appeals the trial court's suppression order arguing that Reddersen was not in custody when Shaline asked to search him and that Reddersen's consent to the search was voluntary. We agree.

## II.

In this case, we review two separate conclusions that the trial court made in its order to suppress the evidence seized from Reddersen.[3] First, we find that the trial court erroneously concluded that Reddersen was in custody when Shaline asked for permission to search. The record shows that the questioning took place during a routine traffic stop. Routine traffic stops do not constitute custody as a matter of law. Second, we find that the trial court erroneously concluded that Reddersen's consent to search was involuntary. In large part, the trial court found that Reddersen's consent to search was involuntary because Shaline failed to advise Reddersen of his *Miranda* rights. However, failure to advise a suspect of her *Miranda* rights alone does not render her consent involuntary, even when the suspect is in custody. After reviewing the evidence in the

finding that failure to give a *Miranda* warning rendered a consent to search involuntary?
 B. Did the Court err in finding that the defendant was in custody merely because the officer had the defendant's driver's license and was awaiting confirmation on license status when the defendant was asked for consent to search his person?

record and the trial court's findings of fact, we conclude that Reddersen's consent to search was voluntary.

### III.

We begin by reviewing the trial court's finding of custody. In reaching its conclusion that Reddersen's consent was involuntary, the trial court made a finding that Reddersen gave his consent during a custodial interrogation. The prosecution contends that the trial court erred in finding that Reddersen was in custody prior to his arrest. As a matter of law, we agree and hold that Reddersen was not in custody prior to his arrest because this encounter constituted a routine traffic stop.

 Prior to any custodial interrogation, the interrogating officer must advise the suspect of her constitutional rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For *Miranda* to be applicable, two requirements must be satisfied: the suspect must be in custody and the statement must be the product of a police interrogation. *See People v. Breidenbach,* 875 P.2d 879, 885 (Colo.1994).

 As a general rule, routine traffic stops do not constitute custody for *Miranda* purposes. *See Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *People v. Wallace,* 724 P.2d 670, 673 (Colo.1986); *People v. Archuleta,* 719 P.2d 1091, 1093 (Colo.1986). Routine traffic stops do not implicate *Miranda* because they involve no more than a brief detention without the aid of weapons and an atmosphere that is less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda. See Berkemer,* 468 U.S. at 437–40, 104 S.Ct. 3138. Moreover, most traffic stops are exposed to public view as they generally take place in public areas. *See id.* at 438,

104 S.Ct. 3138. Given the non-coercive nature of a traffic stop, "the protections afforded by *Miranda* need not be applied unless the defendant's freedom of action is curtailed to a degree associated with formal arrest." *Wallace,* 724 P.2d at 673.

 When determining whether the police curtailed the defendant's freedom to a degree associated with formal arrest during a stop, courts have looked to the force used by the police. In *Breidenbach,* we found that the suspect was in custody for *Miranda* purposes when the police drew their weapons during an investigatory stop. *See Breidenbach,* 875 P.2d at 887 (citing to *United States v. Perdue,* 8 F.3d 1455, 1464 (10th Cir.1993)). In *United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir.1993), the court found that the suspect was in custody during a *Terry* stop when the police handcuffed him before questioning him.[4]

In this case, the trial court found that Reddersen was in custody "[o]nce Officer Shaline confirmed his suspicion by observing the license plate, contacted the [d]efendant, obtained his driver's license, and radioed in for a confirmation of status of the license." Under those circumstances, the trial court concluded that "any reasonable person in the [d]efendant's position would have considered himself deprived of his freedom of action, and would not feel that he was free to leave." We disagree and find that the encounter between Shaline and Reddersen amounted to a routine traffic stop.

In contrast to the trial court's conclusion, routine traffic stops do not constitute custody for *Miranda* purposes, even though "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers." *Berkemer,* 468 U.S. at 436, 104 S.Ct. 3138. As the Supreme Court has recognized, during a

---

**4.** Police-citizen encounters fall into three categories: arrests, investigatory stops and consensual interviews. *See People v. Paynter,* 955 P.2d 68, 72 (Colo.1998). Here, the trial court found that the traffic stop constituted an investigatory stop. Both traffic stops and so-called *Terry* stops are investigatory stops. The same custody analysis applies to both types of stops. *See Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). That is, they do not

constitute custody for *Miranda* purposes unless the officers use extra force.

In this case, we do not address whether the search constituted a justifiable pat down search or frisk as explained in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Shaline, by his own admission, did not have a reasonable suspicion that Reddersen was carrying a weapon.

routine traffic stop, the motorist "will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration." *Id.* at 437, 104 S.Ct. 3138.

■ Here the record indicates that the traffic stop lasted a short period of time. According to Shaline's uncontroverted testimony, less than five minutes passed from the time he approached Reddersen to the time he asked to search him. The officer testified that his demeanor was relaxed and non-confrontational since he had previous contact with Reddersen. The trial court found that "the officer did nothing threatening [or] coercive" during the stop. Consistent with this testimony, Reddersen testified that Shaline never drew his gun. The officer's questioning and subsequent search took place in a public street. The officer did not instruct Reddersen to get into the patrol car or confine him in any other way. The stop occurred only because Reddersen's license plates were still not current.

Unlike the facts of this case, courts have held that a suspect was in custody during an investigatory stop as a result of the force used by the police. In such encounters, the police either drew their weapons or handcuffed the suspect at some point during the stop. *See Perdue,* 8 F.3d at 1464 (police drew weapons); *Smith,* 3 F.3d at 1098 (police handcuffed the suspect); *Breidenbach,* 875 P.2d at 885 (police drew weapons). Here, there is no indication that Shaline used force usually associated with a formal arrest. The force used in this case did not transform this investigatory stop into a custodial interrogation. In fact, the trial court found that Reddersen was polite and cooperative, and that Shaline did not threaten or coerce him.

In conclusion, we disagree with the ruling of the trial court that Reddersen was in custody prior to his arrest. We hold that the record supports the opposite conclusion that this encounter was simply a routine traffic stop. Consistent with United States Supreme Court precedent, we have recognized that a routine traffic stop does not constitute custody for *Miranda* purposes. *See Wallace,* 724 P.2d at 673; *Archuleta,* 719 P.2d at 1093. Because Reddersen was not in custody, the officer was not required to advise him of *Miranda* rights before asking to search.

### IV.

We now address the ruling of the trial court that Reddersen's consent to search was involuntary. The trial court relied largely on the fact that Shaline did not give Reddersen a *Miranda* advisement. However, Shaline's failure to give Reddersen a *Miranda* advisement does not render his consent involuntary. After reviewing the evidence in the record and the trial court's findings of fact, we conclude that Reddersen's consent was voluntary.

### A.

■ We begin our discussion with an overview of the applicable constitutional principles. The Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution prohibit warrantless searches of one's person or property. *See People v. Licea,* 918 P.2d 1109, 1112 (Colo.1996). If a subject voluntarily consents to a search, however, a warrantless search does not violate those constitutional rights protected by the Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution. *See Licea,* 918 P.2d at 1112. Voluntary consent to search is "the product of an essentially free and unconstrained choice by its maker" and not the result of circumstances where the subject's will has been overborne and her capacity for self-determination critically impaired. *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The prosecution has the burden of proving by clear and convincing evidence that the consent was voluntary. *See Licea,* 918 P.2d at 1112.

■ A consensual search is involuntary when "it is the result of duress or coercion, express or implied, or any other form of undue influence exercised against the defendant." *People v. Magallanes–Aragon,* 948 P.2d 528, 531 (Colo.1997) (internal quotations omitted) (quoting *People v. Cleburn,* 782 P.2d 784, 787 (Colo.1989)). Other forms of undue influence include promises, threats

and intrusive police conduct. *See Magallanes–Aragon,* 948 P.2d at 531. A court must initially determine whether there is objective evidence of coercion, duress, deception, promises, threats, intrusive conduct or ·other *undue influence* by the police, which critically impaired the defendant's judgment. *See id.* After considering the evidence of police conduct and the defendant's particular subjective circumstances, the court must decide whether the police conduct could reasonably have appeared to be coercive to a person in the defendant's circumstances. *See id.* This relationship between the police conduct and a person in the defendant's position is critical to a determination of voluntariness. *See id.; People v. Diaz,* 793 P.2d 1181, 1186 (Colo.1990). Pertinent considerations include the characteristics of the defendant, such as age, education,. and knowledge,.as well. as the circumstances of the search, such as the location, duration, and environment. *See Magallanes–Aragon,* 948 P.2d at 531.

### B.

Finding Reddersen's consent involuntary, the trial court relied on the fact that Shaline did not give Reddersen a *Miranda* advisement before asking to search him. The trial court found that "[a]lthough aside from failing to advise the [d]efendant of his rights, the officer did nothing threatening, coercive, or which otherwise might have rendered his consent involuntary, the fact that he was in custody, in the presence of two armed, uniformed police officers, late at night, persuades this [c]ourt to conclude that the consent given by the [d]efendant to search his person was involuntary."

■■■■■ The voluntariness of a consent to search is a question of fact to be determined by the trial court. *See People v. Drake,* 785 P.2d 1257, 1266 (Colo.1990). We must defer to the trial court's findings of fact unless those findings are clearly erroneous or find no support in the record. *See Licea,* 918 P.2d at 1112. As an appellate court, we may decide whether a consent was voluntary if the record clearly contains no evidence to support the trial court's determination. *See Magallanes–Aragon,* 948 P.2d at 533.

After reviewing the record, we conclude that it contains no evidence to support the trial court's determination that Reddersen's consent was involuntary. Rather, the trial court's findings, which are supported by the record, require the conclusion that Reddersen's consent was voluntary.

Initially, the trial court found that Reddersen agreed to the search. The court also found that Reddersen had extensive experience with traffic. stops and knew that he could refuse the officer's request to search him. According to Shaline's uncontested testimony, the encounter was non-confrontational and lasted a short period of time. After considering Reddersen's experience and the circumstances of the search, the trial court concluded that "the officer did nothing threatening, coercive, or which otherwise might have rendered the consent involuntary." The court found that the consent was involuntary because Shaline did not advise Reddersen of his *Miranda* rights before asking to search him.

■■■■ However, failure to give a *Miranda* advisement does not render the consent to search involuntary. *See Licea,* 918 P.2d at 1113 (citing *People v. Helm,* 633 P.2d 1071, 1077 (Colo.1981)). This is true even when the suspect is in custody. *See Licea,* 918 P.2d at 1113. In *Licea,* the suspect consented to a search of his vehicle in a conference room at the sheriff's office before the officers read him his *Miranda* rights. *See Licea,* 918 P.2d at 1111. Unlike here, the defendant was in custody when he gave consent. to search his vehicle without receiving a *Miranda* advisement. *See Licea,* 918 P.2d at 1111. The *Licea* court noted that the suspect's "consent is not rendered involuntary by the fact that he was in custody and was not advised of his constitutional rights before the officers requested his consent to search." *Id.* at 1113. Thus, the trial court's conclusion that Reddersen's consent was involuntary because the officer failed to give him a *Miranda* advisement contradicts our decision in *Licea.*

Based on the record and the trial court's finding that Shaline's conduct was non-coercive, we conclude that Reddersen's consent to search was voluntary. We accept the trial

court's finding that Shaline "did nothing threatening, coercive, or which otherwise might have rendered his consent involuntary," because it is supported by the record. However, we find error in the conclusion of the trial court that Shaline's failure to give Reddersen *Miranda* warnings rendered the search involuntary.

## V.

We reverse the trial court order suppressing the evidence found on Reddersen's person, and in his vehicle, and return this case for further proceedings consistent with this opinion.