The PEOPLE of the State of Colorado,
Plaintiff/Appellant.

v.

Joseph Lorence MEDINA,
Defendant/Appellee.

No. 00SA361.

Supreme Court of Colorado,
En Banc.

June 25, 2001.

David J. Thomas, District Attorney, Donna Skinner Reed, Chief Appellate District Attorney, Golden, CO, Attorneys for Plaintiff/Appellant.

Kenneth A. Padilla, Denver, CO, Attorney for Defendant/Appellee.

Justice HOBBS delivered the Opinion of the Court.

In this interlocutory appeal, we review the trial court's order suppressing statements it found to be involuntary. The trial court concluded that the challenged statements resulted from a police threat, which was calculated to and did result in the defendant's confession. The record supports the trial court's findings of fact and conclusions of law that the interrogating detective's threat to have the child taken from both parents, unless the defendant confessed to injuring the child, had a significant role in inducing his confession. We therefore uphold the trial court's suppression order.

## I.

On March 30, 2000, Joseph Medina (Medina) pled not guilty to two counts of child abuse resulting in serious bodily injury, pursuant to section 18–6–401(1)(a) & (7)(a)(III),

6 C.R.S. (1999), a class three felony. Medina filed a motion to suppress statements he made in two separate interviews with the police as involuntarily given. The trial court held four hearings on the motion between August 31 and October 16, 2000, and issued its suppression order on November 13, 2000. On the issue of whether Medina's statements to the police were voluntary, the evidence in the record upon which the trial court based its suppression order included the following.

On November 24, 1999, the Lakewood Police Department assigned a detective to investigate a possible child abuse incident involving a ten-week-old child. That evening, the detective traveled to Children's Hospital in Denver to see the victim (the child) and interview the family and treating physicians. Doctors at Children's Hospital conducted tests on the child; these tests showed brain injuries and fractured and bruised ribs. The doctors concluded that the injuries were consistent with someone having violently shaken the child.

While at the hospital, the detective spoke with the child's mother, Selena Sandoval (Selena). Selena told the detective that she had taken the child to a babysitter that morning. Approximately two hours after she left the child, the babysitter called, stating that the child was having a seizure. Selena said that Medina, the child's father, might be responsible for the child's injuries.

At the hospital, the detective also spoke with a caseworker assigned by the Jefferson County Department of Social Services, Tanis Doyle (Doyle), the child's maternal grandmother, Mary Sandoval (Mary), and the child's paternal grandmother, Lori Moore (Moore), as well as Medina. After speaking with Medina, the detective told Doyle and Selena that Medina "as much as" admitted to shaking the child and the detective felt certain that he was the perpetrator. Doyle testified that the detective's child abuse investigation at the hospital focused "on Joe Medina." [1] Selena was not a suspect. The detective advised Selena that he had asked Medina to leave the hospital, to have no contact with the child, and to call him at the Lakewood Police Department for an interview. Medina told the detective he would call to set up the interview and intended to cooperate.

Moore testified that the detective asked Medina, her son, to talk with him out in the hall. Medina returned after a ten-minute conversation with the detective. He told Moore that the police "think that I did it," and the detective had ordered him to leave the hospital and to have no contact with his son. Moore confirmed with the detective that he had asked Medina to leave. She asked the detective "what the next step would be for Joseph to be able to be reunited with his son and his family, and [the detective] told me that they would get the help for Joe that he needed, and Joe had his business card and he was to give him a call."

Moore and her husband, Lorence Medina (Lorence), drove Medina to their house to stay because of the detective's directive that Medina have no contact with the child or Selena. Moore described Medina after the hospital episode as being "suicidal," "crying," and talking about "putting a gun in his mouth and blowing his head off." Moore said Medina told her, recounting his encounter with the detective at the hospital the day before, that "unless someone was found responsible for the accident that caused [the child] to be in the hospital, that both parents would not be able to have custody of [the child], that [the child] would go into the foster care system."

Medina testified at the suppression hearing that the detective told him at the hospital that he was

> [s]uspected of abusing [the child]. He told me that I had to come in and speak to him because I was facing serious charges. He said that if I came in, it would be the easy way, as opposed to doing it the hard way where he would have to arrest me.
>
> He told me that if I did come in, that he would help me with the D.A. That he would tell the D.A. that I was cooperating

1. Doyle recorded her conversation with the detective in her notes, including this entry, which are part of the suppression hearing record.

with him. And that she—or that the D.A. would be lenient with me. He told me if I didn't come in, they were going to take [the child] from us. That that was the only way. My only option was to come in and speak to him.

When Medina called the detective to schedule the interview at the police station, the detective told him, referring to Medina and Selena, that "if one person wasn't named as a claimed suspect, if one person wasn't found at fault, that they were going to take [the child] from both of us and I wouldn't see him."

The first interview was videotaped and occurred at the police station on November 26. At this interview, Medina made statements about shaking his son ten days earlier, on November 14, when the child fell off the couch, hit his head, and was not breathing. Medina said the November 14 shaking incident occurred in an effort to get the child to start breathing again. He denied shaking the child in connection with the November 24 injury. Outside the interrogation room, after this interview was completed, Medina asked the detective about whether he could see his son. The detective replied, "[Y]ou didn't help anything . . . why should I."

The next day, on Saturday, November 27, Medina called the detective to arrange a second interview. Lorence testified that he drove Medina to the Monday, November 29 interview after trying to persuade him not to go back to the police station. Lorence testified:

> Well, I asked him why he was going to go down, and he told me that he was going to go down and tell the detective that he was the one that was responsible. And I asked him why, because he told me that he didn't do it. I asked him why. And he said, this way at least [the child] will be with Selena. They would give custody to Selena if he was to come forward.

In a short audiotaped interview at the police station on November 29, Medina confessed to shaking the child on November 24.

At the suppression hearing, the detective denied telling Medina at the hospital or on the phone that the child would be taken from him and Selena and that Medina would be arrested if he did not confess to injuring the child. The detective recalled: "I did say that the child was placed in the custody of the Social Services and that it wouldn't be appropriate for the parents to be around the child after the custody."

The trial court considered the voluntariness of Medina's statements in light of the Fifth Amendment, *Miranda*,[2] fruit of the poisonous tree, and the right to counsel. The trial court decided that Medina was not in custody during the police interviews at either the hospital or the police station. He went to the police station voluntarily, and before each of the interviews commenced, the police told him he was free to leave. Because Medina was not in custody during either interview, the trial court determined that *Miranda* did not apply.

The trial court ruled, however, that Medina's statements to the police on November 26 and 29 at the police station were the product of a continuing threat by the police that rendered those statements involuntary. The trial court's factual findings about the threat and its continuance throughout the interviews with the police include the following. In regard to the hospital encounter between the detective and Medina, the court found:

> [T]he detective probably made statements to the Defendant concerning the child being taken from his custody and that of his wife. The court does not find the detective told Defendant that he would speak with the district attorney and that the district attorney would be lenient if Defendant cooperated.

In regard to the November 26 interview, the trial court found that the detective referred to a prior conversation with Medina when asking questions about his family relationships at the November 26 videotaped interview. The trial court found that the detective stated: " 'Like I explained to you the other night,' indicating that he and Defendant had a prior conversation. '[The detective] began asking Defendant about his

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

family and his relationship with his wife, Selena.' "

In regard to why Medina called the police the day after the November 26 interview and confessed on November 29 to shaking the baby, the court found:

After the interview, Defendant was escorted by the detective out of the security area in the police department, and Defendant left. As Defendant was leaving the security area, he asked [the detective] if he would see his son again. [The detective] replied that Defendant had not done anything to help, and that the detective saw no reason to help Defendant if Defendant was not willing to help himself.

Defendant told his father that he had been told that if he did not confess he would not see his son anymore, that the child would be taken from both parents and placed in the care of the Department of Social Services.

On November 27, 1999, one day after the November 26 interview, Defendant left a message with [the detective's] voice-mail service, requesting to speak again with him.

On November 29, 1999, Defendant went to the Lakewood Police Department. Defendant's father drove him to the police department. He told his father that he was going to tell the detective that he was responsible so at least the minor child could be with his mother. He said that the detective had promised he would get him into classes in parenting and anger management so all the family could be back in the same household.

Lorence Medina tried to persuade his son not to confess to anything he did not do.

Defendant met [the detective] at the Lakewood Police Department on November 29, 1999. He confessed that he had "lost it," and had "shook [the child] a little bit." He admitted he was angry, that the baby was real fussy, that he had started crying real bad, and that he shook him. He admitted that he shook him "pretty hard." Defendant also admitted to drug usage, that he sometimes gets depressed and loses control of his emotions.

The trial court further found:

Defendant thought that if he stopped the interview, the police would just arrest him. He believed for his child to be returned to the child's mother he had to accept blame for the child's injuries.

\* \* \*

Prior to the [November 26] interview, [the detective] had made overt and implied threats directed to Defendant. He ordered Defendant to leave Children's Hospital. He indicated that the child would be taken from Defendant if Defendant did not cooperate. He indicated that criminal investigation or charges would be reviewed against Defendant's wife without further cooperation.

\* \* \*

Defendant was depressed, tired and had lost sleep before the [November 26] interview. He had discussed suicide with his mother. During the interview, he cried. He had also been ill prior to the interview.

Reciting again his finding that the detective did in fact "utilize a threat of taking the minor child from Defendant's family in order to elicit further cooperation from Defendant," the trial judge suppressed the statements Medina made at the police station on November 26 and November 29. Despite the three-day interval between the police station interviews, the trial court found that "the same coercive pressures the police utilized to seek Defendant's confession on November 26, 1999, were present and unabated when Defendant met the officer on November 29, 1999." The court found and concluded that the police threat had operated in a continuum to produce the confession, rendering it involuntary:

In the present case, Defendant's statement of November 29, 1999, though separated by three days from the first statement, were in essence a continuation of the prior questioning. The prosecution may argue that time and informed reflection permitted Defendant to consider whether he voluntarily wished to speak with the detective again, but the coercive police conduct oper-

ated in a continuum from the time the police officer first advised Defendant that his cooperation was necessary if he wished to see his child again up to the time that he told Defendant he would not help him because Defendant had not cooperated and thereafter. The reason Defendant returned to the police station on November 29, 1999 was precisely because of the threats of the officer given on the prior occasion and the officer's implied promise to help Defendant to reunite with his wife and child. Despite the passage of time, the same coercive pressures the police utilized to seek Defendant's confession on November 26, 1999 were present and unabated when Defendant met the officer on November 29, 1999. The officer had done nothing in the interim to reassure Defendant that he would be able to see his child or that he would not review criminal charges against Defendant's wife. Under these circumstances, the taint of the prior illegally induced statement was not removed by the time Defendant spoke with the detective on November 29, 1999, and the November 29, 1999 statement was thereby also rendered involuntary.

The trial court also considered Medina's two requests for counsel during the November 26 interview as a basis for suppressing the statements. Although the trial court determined that the police were not required to advise Medina of his right to counsel or provide him with an attorney, as he was not in custody, the trial court stated that once Medina requested counsel at the November 26 interview, the questioning should have ceased immediately. Instead, the questioning shifted from one detective to another and continued unabated. The trial court said that the police should have provided Medina with a reasonable opportunity to consult counsel before further questioning.[3]

The prosecution appealed the trial court's suppression order to this court pursuant to C.A.R. 4.1, claiming that Medina's first statement was voluntarily given and that no illegal taint burdened the second statement.

The prosecution also asserts that Medina's request for counsel during the first interview was not a basis for suppression, as Medina was not in custody at the time. Finally, should we find that the November 26 statement was involuntary, the prosecution argues that the November 29 statement was sufficiently attenuated to dissipate the initial taint of illegality.

## II.

The record supports the trial court's findings of fact and conclusions of law that the interrogating detective's threat to have the child taken from both parents, unless Medina confessed to shaking the child, had a significant role in inducing his confession. We therefore uphold the trial court's suppression order.

### A.

#### Standard of Review

█ The Fifth Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment, prevents admission of involuntary statements into evidence, regardless of the defendant's custodial situation, and whether or not the defendant made an inculpatory statement. *See Brown v. Illinois,* 422 U.S. 590, 600–01, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416, 425 (1975); *Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963); *People v. McIntyre,* 789 P.2d 1108, 1110 (Colo.1990); *see also* Colo. Const. art. II, § 18 (stating that "[n]o person shall be compelled to testify against himself in a criminal case").

The Fifth Amendment is founded on principles of humanity and civil liberty secured only after years of struggle. *Malloy v. Hogan,* 378 U.S. 1, 9, 84 S.Ct. 1489, 1494, 12 L.Ed.2d 653, 660 (1964). "Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an ac-

---

**3.** We do not reach or analyze this alternative ground for suppressing those portions of Medina's statement following his request for an attorney, *see People v. Romero,* 953 P.2d 550, 557 (Colo.1998), because we hold that the trial court correctly suppressed the entire statement as involuntary.

cused out of his own mouth." *Id.* at 8, 84 S.Ct. at 1493, 12 L.Ed.2d at 658. The states are prohibited from compelling a person to confess through inducements "far short" of "torture." *Id.*

■ In *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998), we said: "Critical to any finding of involuntariness is the existence of coercive governmental conduct, either physical or mental, *that plays a significant role in inducing a confession* or an inculpatory statement .... [T]he deliberate exploitation of a person's weaknesses by psychological intimidation can, under certain circumstances, constitute coercion rendering a statement involuntary." (Emphasis added.) "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has ·deprived a criminal defendant of due process of law." [4] *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473, 482 (1986). "A statement is voluntary if it is the product of rational intellect and a free will unaffected by improper influence, coercion, threats or promises." *McIntyre*, 789 P.2d at 1112 (Rovira, J., dissenting). A court "must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222, 235 (1985).

■ Due to the solicitude of the Fifth Amendment for protection of a criminal defendant against a coerced confession, when a defendant seeks to suppress a statement as involuntary, the prosecution must prove by a preponderance of the evidence that the statement resulted from a free and unconstrained choice by the maker. *See McIntyre*, 789 P.2d at 1111; *see also People v. Gennings*, 808 P.2d 839, 843 (Colo.1991). Coercive physical or psychological conduct by the government renders an otherwise voluntary statement involuntary, if the conduct plays a significant role in inducing the statement. *Gennings*, 808 P.2d at 843–44. The statement must not be the product of any direct

or implied promises, nor obtained by exerting an improper influence. *People v. Quintana*, 198 Colo. 461, 463, 601 P.2d 350, 351 (1979) (holding that a confession was involuntary where the defendant was encouraged to give a statement, because it would be easier on his family if he did so); *see also People v. Freeman*, 668 P.2d 1371, 1380 (Colo.1983) (finding that "the police officer's false representations regarding the extent of their knowledge and evidence of the defendant's participation in the murders, coupled with their assertions of defendant's obvious guilt, contributed to the coercive nature of the interrogation").

■ Courts determine whether a statement was voluntary by considering the totality of the circumstances surrounding the statement. *Gennings*, 808 P.2d at 844. This inquiry includes weighing "the circumstances of pressure against the power of resistance of the person confessing." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405, 413 (2000). The totality of the circumstances analysis should consider the "significant details surrounding or inhering in the interrogation." *Gennings*, 808 P.2d at 844. Among the circumstances a court examines are: (1) whether the defendant was in custody; (2) whether the defendant was free to leave; (3) whether the defendant was aware of the situation; (4) whether the police read *Miranda* rights to the defendant; (5) whether the defendant understood and waived *Miranda* rights; (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation; (7) whether the statement was made during the interrogation or volunteered later; (8) whether the police threatened defendant or promised anything directly or impliedly; (9) the method or style of the interrogation; (10) the defendant's mental and physical condition just prior to the interrogation; (11) the length of the interrogation; (12) the location of the interrogation; and (13) the physical conditions of

---

4. "[T]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *See Connelly*, 479 U.S. at 170, 107 S.Ct. at 523, 93 L.Ed.2d at 486.

the location where the interrogation occurred. *Id.*

### B.

### Medina's Statements

 The trial court's suppression ruling presents a mixed question of fact and law. *People v. Arroya*, 988 P.2d 1124, 1129 (Colo.1999). On appeal, we defer to the trial court's findings of fact, if supported by competent evidence in the record, but review its conclusions of law de novo. *Id.; People v. Garcia*, 11 P.3d 449, 453 (Colo.2000). We will not set aside the trial court's findings of fact on the issue of voluntariness, unless they are clearly erroneous. *People v. Brazzel*, 18 P.3d 1285, 1289 (Colo.2001); *People v. Reddersen*, 992 P.2d 1176, 1182 (Colo.2000).

In *Gennings*, 808 P.2d at 843, we agreed that a statement is not voluntary "if extracted by any sort of threats or violence or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." In that case, the trial court found that the police polygrapher had utilized psychologically coercive tactics to obtain a confession. The defendant was a police officer who voluntarily participated in the examination, was given a *Miranda* warning, and was well aware of his freedom to leave. Because the trial court based its ruling in part on an erroneous conclusion that the defendant was in custody during the polygraph examination, we remanded the case to the trial court for findings regarding the significance of the polygrapher's threat to inform the police department of the defendant's refusal to cooperate with her. In doing so, we emphasized that the credibility of the witnesses and the weight to be accorded their testimony was for the trial court to determine. *Id.* at 846.

In Medina's case, the trial court found that the detective—commencing at the hospital and continuing through the police station interviews—utilized a threat that was calculated to induce and had a significant role in inducing Medina's November 29 confession. The trial court found that the detective "did in fact utilize a threat of taking the minor child from Defendant's family in order to elicit further cooperation from Defendant."

The existence of the threat, its duration, and its impact on Medina's statements are matters of fact that the trial court determined, based upon the witness testimony. After hearing the detective, the social worker, family members, and Medina testify, and upon examining the videotape and audiotape and documentary exhibits, the trial court found that the threat commenced at the hospital, continued through the confession at the November 29 confession, and played a significant role in inducing it.

Because the trial court's findings in regard thereto are not clearly erroneous in light of the record, we must proceed with our analysis cognizant that the detective's threat significantly contributed to Medina's confession. *See Valdez*, 969 P.2d at 211 (stating that critical to any finding of involuntariness is the existence of coercive governmental conduct, either physical or mental, that plays a significant role in inducing a confession).

We have reviewed the videotape of the November 26 interview, the audiotape of the November 29 interview, the transcripts of testimony delivered at the suppression hearing and the exhibits, and now examine the trial court's conclusion of law that Medina's confession was involuntary. The trial court's evaluation of the *Gennings* factors in regard to the November 26 interview illustrates the thoroughness in which the trial judge approached his function in finding the facts and analyzing the totality of the circumstances, in the course of making his legal conclusion:

1. Whether Defendant was in custody or was free to leave and was aware of his situation.

In the present case, on November 26, 1999, Defendant was in fact free to leave the police station and was aware of his situation.

2. Whether *Miranda* warnings were given prior to interrogation.

No *Miranda* warnings were given to Defendant prior to any interrogation by the police officers.

3. Whether Defendant understood and waived his *Miranda* rights.

Defendant never waived his *Miranda* rights or indicated that he understood them.

4. Whether Defendant had the opportunity to confer with counsel or anyone else prior to the interrogation.

Conceivably Defendant could have spoken with an attorney prior to going to the Lakewood police department. Once he mentioned the possible need for counsel during the interrogation, however, the police did not follow up with questions concerning whether he was specifically asking for a lawyer. The interview continued even though Defendant mentioned the possibility of representation.

5. Whether the challenged statement was made during the course of an interrogation or instead was volunteered.

Defendant's statements on November 26, 1999 were elicited during the course of an interrogation. He did not simply call the police to tell them what happened. The police conducted a highly accusatory interview, probing and challenging Defendant on several occasions during the interview.

6. Whether any overt or implied threat or promise was directed to Defendant.

Prior to the interview, [the detective] had made overt and implied threats directed to Defendant. He ordered Defendant to leave Children's Hospital. He indicated that the child would be taken from Defendant if Defendant did not cooperate. He indicated that a criminal investigation or charges would be reviewed against Defendant's wife without further cooperation.

7. The method and style employed by the interrogator in questioning Defendant.

Both [detectives] utilized psychological coercion to interrogate Defendant. The interrogation was coercive. The techniques employed are more fully set forth in the Court's findings of fact above.

8. The length and place of interrogation.

Though the interview did not last more than an hour on November 26, 1999, it was in fact conducted in a secure area of the Lakewood police department. This was an area of comfort to the police officers. It is clear Defendant was not comfortable in the small enclosed room even though he had been told he was free to leave. When he returned on November 29, 1999, he expressly requested that further interviews not be conducted in that room.

9. Defendant's mental and physical condition immediately prior to and during the interrogation.

Defendant was depressed, tired and had lost sleep before the interview. He had discussed suicide with his mother. During the interview, he cried. He had also been ill prior to the interview.

10. Educational background, employment status.

Little information was gleaned concerning Defendant's educational status, but he was apparently unemployed at the time of the interview.

11. Prior experience with law enforcement and criminal justice system.

Little information was provided concerning Defendant's prior experience with law enforcement and the criminal justice system though it appears Defendant had a pending driving under the influence case at the time of the interview.

The trial court's findings and its totality of the circumstances analysis did not begin and end with the November 26 interview. The trial court found that the detective made the threat outside of the recorded sessions. Medina testified that the detective made the threat at the hospital and during a phone conversation arranging the November 26 interview. The trial judge had the benefit of the witnesses appearing before him when he chose to believe Medina's testimony about the threat and to disbelieve the detective's denial of the threat.

Were the record restricted to the November 26 videotape and the November 29 audiotape, we might have concluded that both interviews were voluntary. Medina went to the police station both times on his own; each time the police said he was free to leave at any time. For the most part, the police questioning was straightforward and firm, although the officers raised their voices in the November 26 interview as it proceeded without Medina confessing. The officers utilized a technique of alternating between sympathy and disbelief and handed the questioning off to each other at times; such aspects

of conducting a police interview do not, of themselves, render a defendant's statements involuntary, and neither does the defendant's mental condition, alone, demand such a conclusion. *Valdez*, 969 P.2d at 211.

■ However, "the deliberate exploitation of a person's weaknesses by psychological intimidation" can render the statements involuntary. *Id.* The trial court found evidence in the videotape supporting his finding of fact that a threat had been made previously off the recorded record, that it had induced Medina to make both statements without the aid of a lawyer, that Medina was suffering from emotional and psychological distress, which the police exploited, and, ultimately, that the threat played a significant role in inducing Medina's confession.

Despite the fact that Medina was not in custody on November 26, the videotape demonstrated that the two police officers were interrogating Medina in an effort to obtain his confession. *See People v. Breidenbach,* 875 P.2d 879, 885–87 (Colo.1994) (recognizing that police interrogation may occur even in the absence of custody). On the videotape, the detective who spoke with Medina and other members of his family at the hospital plainly alluded to the prior conversation he had with Medina. The trial court found this to be significant because the detective previously told Medina that Selena would lose custody of the child unless Medina confessed.

When Medina stated midway through the November 26 interview that perhaps he should obtain representation before continuing, the videotape showed that one of the detectives put down his pencil and closed his notepad dramatically, as if disgusted that Medina would choose to get a lawyer and not have the police help him with his family situation, or in recognition that the interview should end, or both. The other detective,

without hesitation, took up the questioning, and Medina did not leave the room but continued answering questions.

When the confession was still not forthcoming, the detectives left Medina alone for a period of time. When they returned, the videotape showed the detective who conveyed the threat to Medina at the hospital and on the phone holding up a folder, saying that Medina had one last chance to help himself because the police had enough to proceed. The trial court found that the "help himself" remark and the other surrounding circumstances of the November 26 interrogation were acted out in a manner calculated to reinforce the threat to the family relationship.

The videotape provides corroboration for the trial court's finding that the threat induced Medina to go to the police station, shaped the November 26 interrogation, and had a significant role in inducing Medina's November 29 confession.[5] *See Valdez,* 969 P.2d at 211. The trial court reasonably concluded, based on its review of the evidence, findings of fact, and totality of the circumstances examination that the police exploited Medina's psychological and emotional vulnerability, commencing at the hospital, continuing on the phone and through the first interview, and culminating in Medina's confession.

The detective threatened Medina with the child's removal from the family, despite his working knowledge as a police officer that the Department of Social Services and a court with jurisdiction would determine the child's placement[6]—a process the detective knew was already underway because of the social worker's presence at the hospital.

■ It was not within the power, responsibility, or province of the interrogating officers to effectuate a temporary, much less a permanent removal of the child from his

---

**5.** Although on November 26 Medina did not confess to shaking the child on November 24, he made damaging admissions that he had violently shaken the child on November 14, a previous incident which made his involvement in the second injury more likely.

**6.** The testimony of Medina and other family members was that the detective's remarks made him and the family believe that the child would

be placed in foster care if Medina did not confess. However, the foster care process involves professional evaluation with court involvement accompanied by due process, focusing on the best interests of the child and taking into account parental views, capabilities, and the family circumstances. *See* § 19–3–500.2, 6 C.R.S. (2000); *see also L.L. v. People,* 10 P.3d 1271, 1275 (Colo. 2000).

mother, although the pendency of criminal charges against both parents might contribute to at least a temporary removal. "When a permanent termination of parental rights is sought, a parent's rights must be protected 'with fundamentally fair procedures.'" *L.L. v. People*, 10 P.3d 1271, 1276 (Colo.2000). Here, the police utilized the threat of acting in the near term against Selena's custody of the child and Medina's long term relationship with Selena and the child if he did not confess.

 In summary, the trial court found and concluded that the police conduct was calculated to cause Medina to believe that: (1) unless he confessed, the detective would cause the child to lose his mother and the mother, her child; and (2) if he did confess, mother and child would be together, and the detective would help Medina to be reunited with them. The trial court's findings regarding the existence of the threat, its duration, and effect on Medina, in light of his emotional and psychological condition, are supported by the evidence. The trial court's conclusion of involuntariness, based on its totality of the circumstances analysis, was justified. Thus, we uphold the trial court's ruling that the police threat played a significant role in inducing Medina's November 26 and 29 statements, rendering those statements involuntary. *See Valdez*, 969 P.2d at 211; *People v. Freeman*, 668 P.2d at 1380. This is not a *Connelly* case in which a defendant sought out the police and, without coercion by them, confessed to criminal activities. *See Connelly*, 479 U.S. at 165–66, 107 S.Ct. at 520–21, 93 L.Ed.2d at 483; *see also Brady v. United States*, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747, 757 (1970) (holding that hard choices made in the course of plea bargaining do not invalidate a guilty plea).

### C.

#### Ongoing Taint

 The fruit of the poisonous tree doctrine, *see Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), precludes the prosecution's use of evidence derived from a constitutional violation. *See Brown*, 422 U.S. at 601–02, 95 S.Ct. at 2260, 45 L.Ed.2d at 426; *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455. Attenuation, an exception to this doctrine, provides that if the prosecution can show that the connection between the constitutional violation and the evidence has become "so attenuated as to dissipate the taint, the evidence will be admissible." *People v. Jones*, 828 P.2d 797, 800 (Colo.1992). The prosecution has the burden of proof on the attenuation issue. *People v. Rodriguez*, 945 P.2d 1351, 1364 (Colo.1997).

 The prosecution urges us to apply the attenuation doctrine to the November 29 confession, should we uphold the trial court's conclusion that the November 26 statement was involuntary. The prosecution cites *Breidenbach*, 875 P.2d at 892, in support of its attenuation argument. *Breidenbach* does not aid the prosecution. There, we first dealt with the inevitable discovery rule. For that exception to apply, the prosecution must show that the challenged evidence would probably have been ultimately or inevitably discovered by lawful means through an independent investigation taking place at the time the illegality occurred. *Id.* at 889. Certainly, this exception cannot apply to an inculpatory statement resulting from a threat, because the evidence is the confession itself.

 As to the second possibility, that defendant's November 29 confession was voluntary because of attenuation due to the lapse of time between the two statements, the presence of intervening circumstances, and consideration of the nature of the official misconduct, *see id.* at 890, the trial court found that no intervening circumstance had interrupted or mitigated the threat; nor had any other occurrence purged its taint. *See People v. Lowe*, 200 Colo. 470, 476–77, 616 P.2d 118, 123–24 (1980). Rather, the threat and its taint were ongoing and induced the November 29 confession. The trial court found:

> The reason Defendant returned to the police station on November 29, 1999 was precisely because of the threats of the officer given on the prior occasion and the officer's implied promise to help Defendant reunite with his wife and child. Despite the passage of time, the same coercive pressures the police utilized to seek Defen-

dant's confession on November 26, 1999 were present and unabated when Defendant met the officer on November 29, 1999.

Based on the trial court's findings and our review of the record, we uphold the trial court's determination that the prosecution did not meet its burden of showing attenuation of the illegal taint. *See People v. Lewis,* 975 P.2d 160, 173 (Colo.1999) (factors for attenuation include: (1) "the temporal proximity of the illegal [conduct] and the confession"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct"; and observing that temporal proximity is the least determinative); *see also* 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(b), at 263–64 (1996) (stating that intervening circumstances are of critical importance); *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428 (placing significant weight on the third factor, the purposeful quality of the illegality).

The trial court found that the threat to Medina's family relationship operated in a continuum through the November 29 interview, and nothing occurred that relieved or removed the taint of the illegality. Because the trial court's finding of fact and conclusion of law that the threat had a significant role in inducing the November 29 confession is supported by the evidence, we uphold the suppression order. *See People v. D.F.,* 933 P.2d 9, 14 (Colo.1997); *Quintana,* 198 Colo. at 464, 601 P.2d at 351.

### III.

Accordingly, we affirm the trial court's suppression order and return the case to the trial court for further proceedings consistent with this opinion.

Justice RICE dissents, and Chief Justice MULLARKEY and Justice COATS join in the dissent.

Justice RICE, dissenting:

The majority holds that in this case, the statements made by the defendant on November 26 and November 29 were involuntary and therefore were properly suppressed by the trial court under the Fifth Amend-

ment. Because I believe that the defendant's statement given on November 29 was made voluntarily, I cannot join the majority opinion. In my view, the record does not support the trial court's determination that the defendant's confession on November 29 was an involuntary product of a threat by the police. Therefore, I respectfully dissent.

### A. Fifth Amendment

The Fifth Amendment prohibits admission of a defendant's involuntary statement. *See Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The prosecution must establish by a preponderance of the evidence that the defendant made the statement voluntarily in order for a challenged statement to be admitted. *People v. Valdez,* 969 P.2d 208, 211 (Colo.1998); *People v. Gennings,* 808 P.2d 839, 843 (Colo.1991). In doing so, the prosecution must demonstrate that coercive government conduct did not play a significant role in inducing a defendant's confession. *Colorado v. Connelly,* 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Valdez,* 969 P.2d at 211; *Breidenbach,* 875 P.2d 879, 891 (Colo.1994); *Gennings,* 808 P.2d at 843.

A challenged statement may be suppressed as involuntary under the "fruit of the poisonous tree" doctrine if the statement is made as a result of a constitutional violation. *People v. Lewis,* 975 P.2d 160, 170 (Colo.1999); *People v. Thomas,* 839 P.2d 1174, 1180 (Colo. 1992). Attenuation is an exception to the fruit of the poisonous tree doctrine. *Lewis,* 975 P.2d at 170; *Thomas,* 839 P.2d at 1180; *People v. Lee,* 630 P.2d 583, 590–91 (Colo. 1981). The attenuation exception allows the admission of evidence when the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint. *Lewis,* 975 P.2d at 170.

We have previously held that any alleged illegal taint may be purged by demonstrating the voluntariness of a later confession. *Breidenbach,* 875 P.2d at 892; *Thomas,* 839 P.2d at 1180. The ultimate test of voluntariness is whether the individual's will has been overborne. *Valdez,* 969 P.2d at 211;

*People v. Mendoza–Rodriguez,* 790 P.2d 810, 816 (Colo.1990). Generally, when determining whether a defendant's statements were voluntary, a trial court must consider the totality of the circumstances, including the following factors: (1) whether the defendant was in custody or was free to leave and aware of his situation; (2) whether Miranda warnings were given prior to any interrogation and whether the defendant understood and waived his Miranda rights; (3) whether the challenged statement was made during the course of an interrogation or instead was volunteered; (4) whether any overt or implied threat or promise was directed to the defendant; (5) the method and style employed by the interrogator; and (6) the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system. *Valdez,* 969 P.2d at 211; *Breidenbach,* 875 P.2d at 891; *Gennings,* 808 P.2d at 844.

Three particular factors must be considered in conjunction with these general factors when determining whether a defendant's statements are sufficiently voluntary as to dissipate any alleged illegal taint: (1) the time between statements; (2) the change in place of interrogations; and (3) the change in identity of the interrogators. *Breidenbach,* 875 P.2d at 892; *Thomas,* 839 P.2d at 1181. We have further recognized that the presence of intervening circumstances and the purpose and flagrancy of the official misconduct are also relevant under this inquiry. *Lewis,* 975 P.2d at 173.

### B. The November 29th Interview

In light of these principles, my review of the trial court's findings and the balance of the record in this case persuades me that the defendant's November 29 confession was made voluntarily and was therefore sufficiently attenuated from any alleged illegal taint as to warrant admission. Thus, I disagree with the majority's determination that

the defendant's November 29 statement was induced by an alleged ongoing threat by the police that had begun several days earlier. I also disagree with the majority's conclusion that the prosecution failed to meet its burden of proving attenuation under the fruit of the poisonous tree doctrine. Applying the relevant factors discussed above, I conclude that the trial court's factual findings and the balance of the record unmistakably demonstrate that the defendant's November 29 confession was made voluntarily.

The record makes clear that at the time of the defendant's November 29 confession, he was not in custody, he was told that he was free to leave, and that his statement was volunteered, rather than made during the course of an interrogation. Indeed, even the majority acknowledges that, "Medina went to the police station both times on his own; each time the police said he was free to leave at any time." Maj. Op. at 1224. Moreover, the trial court's findings demonstrate the deliberateness with which the defendant made his November 29 statement. The trial court found that the day after the November 26 interview, the defendant had left a message with the detective's voice-mail service, requesting to speak with him again. The record indicates that the detective returned the defendant's phone call and that the defendant told the detective at that time that he wanted to speak to him specifically about his previous statement. Finally, the trial court found that on November 29, the defendant had his father drive him to the Lakewood Police Department. Thus, the record indicates that the defendant's November 29 confession was made after he deliberately scheduled a second interview two days in advance.

Indeed, the defendant's November 29 confession occurred three full days after the first allegedly coercive interview.[1] During the intervening time between the defendant's first interview and his later confession, the defendant was not in custody and was allowed to return home. There, he had the opportunity

---

**1.** Although temporal proximity is generally the least determinative factor, here the significant lapse between the police's allegedly coercive acts and the defendant's confession allowed for inter-

vening circumstances that support the voluntariness of Defendant's statement. *See Lewis,* 975 P.2d at 174.

to discuss his situation with family members and friends, or to contact an attorney. In fact, the trial court found that during the intervening time frame, the defendant's father had tried to persuade the defendant not to confess. Moreover, the record indicates no continued threats by the police between the November 26 interview and the defendant's November 29 confession.[2]

Furthermore, the conditions present during the defendant's November 29 confession indicate no coercion. First, according to the trial court, the location of the interview was changed from the interview room used on November 26 to an open cafeteria at the defendant's request. Finally, in contrast to the trial court's findings that the defendant was depressed, tired, and had cried during the November 26 interview, the trial court made no findings as to any deterioration of the defendant's mental state immediately prior to or during his November 29 interview. Nor, as the majority acknowledges, does a review of the audiotape recording of the short November 29 interview indicate any police coercion or involuntariness on the part of the defendant. Maj. Op. at 1224 ("Were the record restricted to the November 26 videotape and the November 29 audiotape, we might have concluded that both interviews were voluntary.").

I therefore conclude that neither the trial court's findings, nor a review of the balance of the record demonstrate that the defendant's November 29 statement was made involuntarily.[3] There is no indication in the record that the defendant's will had been overborne prior to making his November 29 statement. *See Valdez*, 969 P.2d at 211;

*Mendoza–Rodriguez*, 790 P.2d at 816. Instead, the record clearly demonstrates that the defendant, of his own free will, contacted the detective, prearranged a meeting, chose the meeting place (the open cafeteria), and voluntarily made his confession. I would therefore reverse the trial court's order suppressing the defendant's confession. *See Valdez*, 969 P.2d at 211 (holding that an ultimate conclusion of constitutional law that is inconsistent or unsupported by evidentiary findings is subject to correction by a reviewing court); *Gennings*, 808 P.2d at 844 (same); *People v. Quezada*, 731 P.2d 730, 732–33 (Colo.1987) (same).

### C. Conclusion

In summary, I find that the prosecution met its burden of proving by a preponderance of the evidence that the defendant's November 29 confession was made voluntarily and was therefore a product of his own free will. Thus, I find that the defendant's confession was sufficiently attenuated from any alleged coercive police action to have dissipated any resulting taint. Accordingly, I would reverse the trial court's order suppressing the defendant's November 29 confession and therefore respectfully dissent.

I am authorized to say that Chief Justice MULLARKEY and Justice COATS join in this dissent.

---

**2.** I disagree with the majority's conclusion that "nothing occurred that relieved or removed the taint of the illegality," based on the trial court's finding that, "The officer had done nothing in the interim to reassure Defendant that he would be able to see his child or that he would not review criminal charges against Defendant's wife." Maj. Op. at 1227, 1221. Nothing in the relevant caselaw requires such reassurance by the police to dissipate the taint of previously illegal action. Instead, the presence of other intervening circumstances such as those described above suffice to dissipate the taint of any illegal police action.

**3.** Indeed, the trial court did not subject its findings concerning the November 29 interview to a

voluntariness analysis under the relevant factors but instead determined only that, "even though a reasonable person in Defendant's position would have considered himself free to leave the interview, the Court finds coercive governmental conduct of a psychological or mental nature that played a significant role in inducing Defendant's statements of November 29, 2000." (R. vol.I, p. 132). However, in concluding that the defendant's November 26 statements were made under coercion, the trial court engaged in an extensive factor-by-factor voluntariness analysis, focusing on its findings concerning the events surrounding the November 26 interview.