MADDOX, Justice.
The issue in this case involved whether the Marshall County Gas District unlawfully distributed $6 million to the cities of Albertville, Arab, and Guntersville. The plaintiff class claims that the gas district failed to follow the provisions of § 11-50-411, Ala.Code 1975, in making the distribution. The trial judge entered a summary judgment in favor of the defendants. We affirm.
The member cities argue that before the distribution of the $6 million, the gas district had not distributed to them the amount of net income to which they were entitled, but had instead used “internally generated funds to pay the costs of capital improvements and additions in lieu of borrowing funds to pay for such costs.”
The main issue presented, therefore, is whether the actions of the Marshall County Gas District challenged by the class plaintiffs violated § 11-50-411, Ala.Code 1975. The plaintiffs sought both damages and equitable relief.
I.
All parties agree that the facts of this case are essentially undisputed. The Marshall County Gas District (“the District”) is a public corporation and a political subdivision of the State of Alabama; it was incorporated in 1953 by the cities of Albertville, Arab, and Guntersville (the “member cities”), pursuant to §§ 11-50-390 through 11-50-417, Ala. Code 1975. The District transports, distributes, and sells gas and gas services to various residential, commercial, institutional, and industrial customers within the member cities and in other parts of Marshall County. The plaintiffs are customers of the District.
In June 1989, the District had two series of revenue bonds outstanding: the Series 1966 bonds in the principal amount of $2,025,000 and the Series 1971 bonds in the principal amount of $410,000. As the first step in a plan to change the District’s capital structure, the District undertook to defease the Series 1966 and Series 1971 bonds through the establishment of an escrow fund in accordance with the provisions of the 1966 Pledge Agreement and Trust Indenture (“1966 Indenture”). An executed Escrow Trust Agreement dated June 1, 1989, provided for the establishment of an escrow fund consisting of federal securities, or bank obligations collateralized by federal securities, that generate payments of principal and interest sufficient to pay all debt service on the Series 1966 and Series 1971 Bonds until their final maturity. The defeasance of the Series 1966 and Series 1971 Bonds is not challenged by the plaintiffs.
The second step of the plan undertaken by the District was the preparation of an accountant’s audit report for the preceding 10 years, which was intended to determine the allowable increase in the District’s distributable net income under § 11-50-411, Ala.Code 1975, that would result from the defeasance of the outstanding bonds and to determine the aggregate amount of capital expenditures made by the District with internally generated funds during the 10-year period. This report was prepared by the firm of Snow Stewart & Strickland, certified public accountants of Birmingham, Alabama. This report (“the Snow report”) covered nine complete fiscal years of the District from September 1, 1979, to August 31, 1988, and 11 months of the 1989 fiscal year, which began September 1, 1988. The Snow report was based upon a legal interpretation of subparagraph (1) of § 11-50-411 that, as a result of the defea-sance of the Series 1966 and Series 1971 bonds, certain deductions for payments into the 1966 Indenture funds should be added back to distributable net income on the ground that these payments were not considered to constitute permanent deductions from net income to the extent that they *361 represented amounts stored in the 1966 Indenture funds at the time of the defeasance and had not otherwise been required by the provisions of § 11-50-411 to be permanently deducted as payments of principal, interest, or operating expenses. Following this interpretation, the Snow report determined the cumulative amount of distributable net income of the District that had not been distributed during the 10-year period in question. It also determined the cumulative amount of capital expenditures that had been made during the 10-year period with the District’s internally generated funds and that had not been previously funded with another source of financing.
In August 1989, the District took the final step in its plan to change its capital structure and authorized the sale and issuance of $7,015,000 principal amount of the District’s Gas Revenue Bonds, Series 1989 (“Series 1989 Bonds”). The Series 1989 Bonds were sold to SouthTrust Bank for $6,609,032.50 (about 94.2% of par or face value). Of this amount, $609,032.50 was deposited in a special debt service reserve fund and the $6 million balance was paid, in equal shares of $2 million each, to the three member cities. The stated purpose for issuing the Series 1989 Bonds was to reimburse the District for certain capital improvements to its gas system made with internally generated funds in past years as well as to reimburse the District for depreciation of certain assets and establishment of certain reserve funds. Between 1980 and 1989, the District had used internally generated funds to pay the costs of capital improvements and additions; this payment significantly reduced the amount of net income available for distribution to the member cities. In short, the District borrowed money to reimburse itself for expenditures of internally generated funds for capital improvements over the previous 10 years. It considered the borrowed money to be the source of funding for the capital improvements and the internally generated funds to be undistributed distributable net income. The year after the issuance of the Series 1989 Bonds and the $6 million distribution of the proceeds, the District increased the rates for gas and gas service furnished to its customers.
On August 22, 1991, the Board of Education of Marshall County filed a class action by and for customers of the District, against the District, the member cities, and the mayors of the member cities in their capacities as members of the board of directors of the District and as the respective mayors of the member cities. J.B. Carlton and Edward N. Nesmith were added as additional plaintiffs and class representatives on August 26,1991. On September 13, 1991, the Marshall County Board of Education withdrew as a plaintiff, and J. Rayford Brothers joined as an additional plaintiff and representative on January 31, 1992. The complaint alleged that the member cities had unlawfully received from the District, and that the District had unlawfully distributed to the member cities, the aggregate sum of $6 million, or $2 million for each member city. The plaintiffs sought monetary damages, the return of the $6 million to the District, with interest, and an injunction restraining the defendants from spending any more of the moneys received. The defendants moved for a summary judgment, and on July 2, 1993, the circuit court entered a summary judgment for the defendants. The circuit court held that the plaintiffs were properly before the court and rejected the defendants’ claims of laches, collateral estoppel, and res judicata as defenses. The court held that the actions of the defendants were permitted under Alabama law and that there were no factual issues in dispute precluding judgment.
II.
Because the issue of standing is not properly presented for review and because we agree with the trial court that there are no material factual questions, this case turns upon the interpretation of § 11-50-411. This section was amended twice during the time period covered by the Snow Report. Between 1951 and 1983, § 11-50-411 (and its predecessor) read as follows:
“All revenues and income of the gas transmission system or systems of a gas district incorporated under this article in excess of sums required for the operation, maintenance and repair of the gas transmission system or systems for a period of at least *362 six months, all sums required for the payment of principal and interest on its bonds and all sums required to be paid into special funds or otherwise obligated by the terms of the mortgages, indentures of trust, security agreements or bond resolutions under and pursuant to which its bonds were issued and a reasonable reserve for future extensions and improvements shall, unless otherwise provided in the certificate of incorporation of such district, be divided among its member municipalities in proportion to the amount of gas sold to or within each such municipality.
“All revenues and income of each gas distribution system of any such district in excess of the sums required for the operation, maintenance and repair of such gas distribution system for a period of at least six months, all sums required for the payment of principal of and interest on its bonds and all sums required to be paid into special funds or otherwise obligated by the terms of the mortgages, indentures of trust, security agreements or bond resolutions under and pursuant to which its bonds were issued and a reasonable reserve for future extension and improvements shall, unless otherwise provided in its certificate of incorporation, be distributed and paid to the municipality or municipalities within which such distribution system is located.”
In 1983, the legislature passed Act No. 83-613, AlaAets 1983, which amended § 11-50-411 to read as follows:
“All the net income of the gas transmission system or systems for each fiscal year, of a gas district incorporated under this article shall, unless otherwise provided in the certificate of incorporation of such district, be divided, within a reasonable amount of time after the close of each fiscal year, among its member municipalities in proportion to the amount of gas sold to or within each such municipality.
“All the net income of each such gas distribution system, for each fiscal year, of any such district shall, unless otherwise provided in its certificate of incorporation, be distributed and paid, within a reasonable time after the close of each fiscal year, to the municipality or municipalities within which such distribution system is located.
“The term ‘net income’ as used in the preceding two paragraphs of this section shall mean, with respect to the system or systems and for the fiscal year in question, the net income thereof computed in accordance with generally accepted accounting principles plus depreciation and amortization less the sum of the following:
“(a) all sums required during such fiscal year for the payment of principal and interest on its bonds and all sums required to be paid during such fiscal year into special funds or otherwise obligated by the terms of the mortgages, indentures of trust, security agreements or bond resolutions under and pursuant to which its bonds were issued (other than such as constituted operating expenses and were taken into consideration in the determination of ‘net income computed in accordance with generally accepted accounting principles’),
“(b) all sums expended during such fiscal year for capital additions and improvements to such system or systems or for retirement of debt not previously funded and paid with internally generated funds from operations (not including, however, any sums expended for either of such purposes out of any special funds referred to above),
“(c) an amount which, when added to the amount (if any) held in reserve at the end of such fiscal year for future expenses of operating such system or systems, will equal 50% of the estimated expenses of operating such system or systems for the then current fiscal year (not including, as an expense of operating any such system or systems, the cost of any purchased gas), and
“(d) an amount which, when added to the amount (if any) held in reserve at the end of such fiscal year for future capital additions and improvements to such system or systems, will equal a reasonable reserve (the minimum amount of which may be specified in the certificate of incorporation of such district but which, subject to any such specification, shall be deter *363 mined by the board of directors of such district) for future capital additions and improvements to such system or systems.
“If any gas district incorporated under the provisions of this article provides, in its certificate of incorporation, for the disposition of the net income of all its gas transmission and distribution systems in the same manner, it may, for purposes of such disposition, compute net income for all its gas transmission and distribution systems as a unit rather than separately.”
In 1989, the legislature passed Act No. 89-705, Ala.Aets 1989, which amended § 11-50-411 to read as follows (with the changes from the 1983 enactment emphasized):
“All the net income of the gas transmission system or systems for each fiscal year, of a gas district incorporated under this article shall, unless otherwise provided in the certificate of incorporation of such district, be divided, with a reasonable amount of time after the close of each fiscal year, among its member municipalities in proportion to the amount of gas sold to or within each such municipality.
“All the net income of each such gas distribution system, for each fiscal year, of any such district shall, unless otherwise provided in its certificate of incorporation, be distributed and paid, within a reasonable time after the close of each fiscal year, to the municipality or municipalities within which such distribution system is located.
“The term ‘net income’ as used in the preceding two paragraphs of this section shall mean, with respect to the system or systems and for the fiscal year in question, the net income thereof computed in accordance with generally accepted accounting principles plus depreciation and amortization less the sum of the following:
“(1) All sums required during such fiscal year for the payment of principal and interest on its bonds and all sums required to be paid during such fiscal year into special funds or otherwise obligated by the terms of the mortgages, indentures of trust, security agreements or bond resolutions under and pursuant to which its bonds were issued (other than such as constituted operating expenses and were taken into consideration in the determination of ‘net income computed in accordance with generally accepted accounting principles’),
“(2) All sums expended during such fiscal year for capital additions and improvements to such system or systems or for retirement of debt not previously funded and paid with internally generated funds from operations, not including, however, (i) any sums expended for either of such purposes out of any special funds referred to above, nor (ii) if and to the extent that the certificate of incorporation of such district expressly so provided, any sums expended for either of such purposes out of any other moneys or funds (provided, that the board of directors of such district by duly adopted resolution determines, at any time or times prior to any distribution of ‘net income’ for the fiscal year in question, that such district has, from retained earnings, current year’s earnings or otherwise, current assets sufficient to enable it to disregard, in the computation of such ‘net income, ’ any such sums so expended for capital additions and improvements),
“(3) An amount which, when added to the amount (if any) held in reserve at the end of such fiscal year for future expenses of operating such system or systems, will equal 50 percent of the estimated expenses of operating such system or systems for the then current fiscal year (not including, as an expense of operating any such system or systems, the cost of any purchased gas), and
“(4) An amount which, when added to the amount (if any) held in reserve at the end of such fiscal year for future capital additions and improvements to such system or systems, will equal a reasonable reserve (the minimum amount of which may be specified in the certificate of incorporation of such district but which, subject to any such specification, shall be determined by the board of directors of such district) for future capital additions and improvements to such system or systems. “If any gas district incorporated under the provisions of this article provides, in its certificate of incorporation, for the disposi *364 tion of the net income of all its gas transmission and distribution systems in the same manner, it may, for purposes of such disposition, compute net income for all its gas transmission and distribution systems as a unit rather than separately; and, in any such case, such certificate of incorporation may provide for and authorize the distribution and payment, in the discretion of the board of directors of any such gas district, of an amount less than the net income of all stick systems for any fiscal year, in which event (A) that portion of such net income for any such fiscal year not so distributed and paid shall be available for distribution and payment in future fiscal years as and to the extent provided in such certificate of incorporation, and (B) such certificate of incorporation may also specify that such provision and authorization shall operate both prospectively and retrospectively, so as to ratify and confirm (i) any prior distributions and payments of amounts less the net income of all such systems for any prior fiscal year, and (ii) the availability (for distribution and payment in future fiscal years) of any portion thereof not so distributed and paid.”
III.
The plaintiff class contends that certain retroactive adjustments were made by the District to its net income for 1980, 1981, and 1982 that are authorized only by the 1983 amendment to § 11-5CM11 and that resulted in the distribution of amounts in excess of what was permitted by law. The class contends that this alleged overstatement of net income for 1980-82 was caused by an improper exclusion of the cost of gas purchased from operating expenses and by the adding back of depreciation and amortization to book net income, which were not allowed before 1983. They contend that the total amount of this overstatement is at least $2,700,000.
The District admits that it used the formula for determining distributable net income contained in the 1983 amendment to § 11-50-411, but it argues that the pre-1983 version of this statute is functionally equivalent to the statute as amended in 1983 with regard to the points raised by the plaintiffs. The District points out that the pre-1983 version of the statute did not specify whether the cost of purchased gas was to be included when calculating the sums required for the operation, maintenance, and repair of the system, while the 1983 amendment to the statute made it clear that the cost of purchased gas was not to be included in that calculation. The District argues that the plaintiffs’ insistence that the cost of purchased gas had to be included in the calculation of the operating cost of the District is based solely on the fact that the statute, which was otherwise silent on the matter, was amended to specifically state that the cost of gas was not to be included in this calculation. It maintains that under the plaintiffs’ interpretation of the pre-1983 version of § 11-50-411 that which is not expressly permitted by the statute is forbidden and the addition of an amendment necessarily means that the prior law was contrary to the terms of the amendment.
We agree with the District that the plaintiffs’ argument on this point is logically flawed and that a reasonable interpretation of the pre-1983 statute would allow the cost of gas purchased to be excluded from the calculation of the operating cost of the District. The cost of purchased gas for a gas utility varies directly with the volume sold. The payment for a month’s supply of gas does not precede by more than a month the collection of the sales price from the utility’s customers, and no gas utility has storage capacity for six months’ worth of gas sales. On the other hand, most of the other operating expenses of a gas utility are relatively insensitive to volume. Therefore, the business rationale for setting aside a six-month operating expense reserve does not apply to the cost of gas.
Likewise, the District points out that the 1983 amendment to § 11-50-411 expressly allows depreciation of assets and amortization of intangible assets to be included in distributable net income, while the statute before 1983 was silent on the matter. The District contends that nothing in the 1983 statute would indicate that the legislature *365 intended for gas districts to deviate from generally accepted principles for determining the cash flow of an enterprise. It argues that while depreciation and amortization are deducted as non-cash expenses under the generally accepted accounting formula for determining net income (revenue-expenses = net income), the amount of these non-cash expenses may be customarily added back to net income in the determination of any enterprise’s cash flow. We agree with the District that, in the absence of prohibitory statutory language, it is reasonable for a gas district to add these non-cash expenses back into accounting net income in order to determine the actual distributable net income.
IV.
The plaintiffs argue that the distribution of the $6 million to the member cities violated § 11-50-411 because the money was distributed evenly among the three cities although the statute requires income to be distributed, unless otherwise provided in the District’s charter, “in proportion to the amount of gas sold to or within” each member city. We hold, however, that this issue is not properly before us. An examination of the record shows that the plaintiffs failed to raise the issue of the legality of the allocation of the distribution in either their complaint or their response to the defendants’ motions for summary judgment. The plaintiffs challenged only the legality of the recalculation of distributable net income and the distribution of the $6 million, seeking a return of the entire amount to the District. They did not challenge the allocation of the $6 million among the member cities. Therefore, the issue is not properly before us.
V.
The plaintiffs contend that the District, in recalculating distributable net income for the Snow Report, failed to deduct payments into special funds related to the 1966 Indenture. The plaintiffs argue that § 11-50^411(1) requires the deduction from distributable net income of “all sums required to be paid during such fiscal year into special funds or otherwise obligated by the terms of the mortgages, indentures of trust, security agreements or bond resolutions under and pursuant to which its bonds were issued.” Therefore, the plaintiffs maintain that these omitted deductions from the Snow Report resulted in overstating the District’s distributable income.
The District contends that all amounts that are required to be deducted by § 11-50-411 for payment of operating expenses and interest, for the payment of principal and for the payment of capital expenditures, including any amounts originally set aside in 1966 Indenture funds and subsequently withdrawn to make any such payments, have been deducted. The District says that the Snow Report takes into account every payment or expenditure for operating expense, interest, debt retirement or capital investment that, for the 10-year period in question, was required by § 11-50-411 to be deducted in the computation of distributable net income. The District admits that the Snow Report’s computation of distributable net income did not deduct any portion of payments into 1966 Indenture funds that represented cash balances then held in the funds of the 1966 Indenture. The District explains that the Snow Report deducted from distributable net income all payments into the Indenture funds that flowed through for purposes requiring deduction, such as operating expenses, interest, principal, and capital expenditures; thus, the District says, only the residual amounts held in the funds were not deducted. The District explains that this approach was taken in preparing the Snow Report because, it says, the defeasance of the Series 1966 and Series 1971 Bonds eliminated the legal reason for the 1966 Indenture and, by the terms of Section 11.11 of the 1966 Indenture, released the moneys then held in such funds for any lawful purpose of the District. The District contends that it would be an unreasonable interpretation of § 11-50-411(1) to require the continued withholding of moneys from distributable net income that are available to the District and are no longer subject to the restrictions of the 1966 Indenture.
We agree with the District that it would be unreasonable to interpret § 11 — 50—411(1) so as to require the deduction of residual amounts in indenture funds once the reason *366 for the funds has been eliminated. The de-feasance of the Series 1966 and 1971 Bonds eliminated the purpose of the 1966 Indenture funds. Therefore, all amounts paid into those funds that were not actually expended for purposes requiring deduction were properly added back into the District’s distributable net income.
VI.
The plaintiffs contend that the $6 million distribution to the member cities was unlawful because, they argue, § 11-50-411 requires that net distributable income for a fiscal year be determined shortly after the close of the fiscal year and they argue the determination may not be done before that time nor revised after that time. They base this contention on these portions of § 11-50-411:
“All the net income of the gas transmission system or systems for each fiscal year, of a gas district incorporated under this article shall, unless otherwise provided in the certificate of incorporation of such district, be divided, within a reasonable amount of time after the close of each fiscal year....
“All the net income of each such gas distribution system, for each fiscal year, of any such district shall, unless otherwise provided in its certificate of incorporation, be distributed and paid, within a reasonable time after the close of each fiscal year....”
The plaintiffs thus contend that, because the $6 million distribution represents a later adjustment to net distributable income for the years 1980 to 1988 and an early calculation of the net distributable income for only the first 11 months of 1989, the distribution is unlawful.
The District points out that before the 1983 amendment, § 11-50-411 made no reference to a fiscal year. It maintains that the introduction of the concept of a fiscal year in the 1983 amendment was merely to apply a reasonable and conventional time frame in which to apply the prescribed formula for the computation of the distributable net income and that it was not intended to defeat the member cities’ entitlement to the full net distributable income. The District argues that § 11-50-411 is for the protection of member cities in that it requires a gas district to pay them the income to which they are entitled within a reasonable time after the close of the fiscal year if for some reason there was some neglect or delay on the part of a gas district by failing to distribute the income on a regular basis.
We agree with the District that the language pertaining to fiscal years and the calculation and distribution of distributable net income in § 11-50-411 should not be construed to prevent valid adjustments to the determinations of income for prior years. The phrase “within a reasonable time after the close of each fiscal year” in § 11-50-411 should not be construed to defeat the ownership interest of the member cities in the District’s undistributed distributable income. Such a construction is also supported by the fact that the legislature amended § 11-50-411 in 1989 to state:
“[The] certificate of incorporation may provide for and authorize the distribution and payment, in the discretion of the board of directors of any such gas district, of an amount less than the net income of all such systems for any fiscal year, in which event (A) that portion of such net income for any such fiscal year not so distributed and paid shall be available for distribution and payment in future fiscal years as and to the extent provided in such certificate of incorporation, and (B) such certificate of incorporation may also specify that such provision and authorization shall operate both prospectively and retrospectively, so as to ratify and confirm (i) any prior distributions and payments of amounts less the net income of all such systems for any prior fiscal year, and (ii) the availability (for distribution and payment in future fiscal years) of any portion thereof not so distributed and paid.”
After the effective date of this 1989 amendment to the statute, a gas district would be required to expressly authorize in its certificate of incorporation that income not distributed in any fiscal year would be available for distribution in future fiscal years, but it does not follow that such distributions of income *367 were prohibited before the 1989 amendment was effective. Requiring a practice to be explicitly authorized in the future does not necessarily condemn as unlawful a practice that existed in the past. It appears to us that the legislature was aware of the practice by which gas districts distributed a prior fiscal year’s income in future fiscal years and sought by the amendment to require such practices in the future to be expressly authorized by the certificate of incorporation.
Our interpretation of the statute would permit adjustment to the income of a gas district for prior fiscal years, as a generally accepted accounting principle under appropriate circumstances. Generally, prior year adjustments are items referable to prior fiscal years that have an effect upon the retained earnings of the enterprise but which cannot be appropriately recognized in the current fiscal year. Consequently, depending upon the nature of the circumstances that justify a prior period adjustment to an organization’s income, it may be made by restating the income for the fiscal year in question or by making a direct adjustment to retained earnings. When these principles are applied to the circumstances here, it appears that when the bond issue was defeased and the payments required to be stored in trust accounts under the indenture were no longer required to be set aside as security for the bondholders, and when capital additions initially financed with internally generated funds were, at a time after their initial acquisition, financed with long-term debt, then a prior period adjustment could may be made for the fiscal year in which such payments were originally deducted, thereby increasing the distributable net income by the amount of the deduction that was no longer required and served no useful purpose. It would appear to us that without such an adjustment, § 11-50-411 could constitute a trap that would require the member cities to keep the level of retained earnings in the District beyond what the legislature intended. Under the laws of this state, gas districts are public corporations that, except where prohibited by statute, enjoy all of the latitude and discretion permitted a private corporation in the conduct of its affairs. We, therefore, hold that the $6 million distribution by the District to the member cities did not violate § 11-50-411, Ala.Code 1975.
VII.
In summary, we hold that the issue of the plaintiffs’ standing to sue is not properly before us. We hold that the apportionment among the member cities of the $6 million distribution is also not properly before us. We also hold that there are no genuine issues of material fact to be resolved and that the District did not violate § 11-50-411 in de-feasing the Series 1966 and Series 1971 bonds, in recalculating distributable net income for the years 1980-1989, in reimbursing itself for certain capital improvements made with internally generated funds and financing them instead with long-term debt, and in distributing $6 million to the three member cities. Accordingly, we affirm the summary judgment.
AFFIRMED.
ALMON, HOUSTON, STEAGALL and INGRAM, JJ., concur.