The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

Bobby **COLLINS**, Defendant–Appellant.

No. 06CA1235.

Colorado Court of Appeals.
Div. VI.

Feb. 18, 2010.

John W. Suthers, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Tracy C. Renner, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

Defendant, Bobby Collins, appeals the judgment of conviction entered upon jury verdicts finding him guilty of second degree kidnapping, first degree sexual assault, and attempted aggravated robbery. He also appeals the sentence imposed. We affirm.

## I. Background and Procedural History

On December 4, 1999, while walking home after working a late-night shift at a downtown Denver bar, the victim (K.D.) was confronted, kidnapped, robbed, and sexually assaulted by an unknown assailant. In 2000, police developed a DNA profile from semen collected from K.D.'s rape kit, but were unable to identify a suspect at that time. In 2002, the Denver police crime lab did further DNA testing and created an enhanced DNA profile from the semen sample.

In August 2002, defendant was charged in Missouri with an unrelated armed robbery that occurred in March 2002. In connection with the investigation of this robbery, Missouri law enforcement officials believed that they could link defendant to the crime through DNA left on a ski mask that was used in the robbery. Accordingly, the Missouri prosecutor filed a motion for a court order to compel defendant to provide a saliva sample to obtain his DNA. Although defendant initially refused to provide a DNA sample, in February 2003, defendant orally consented to give a DNA sample. Missouri investigators then took a DNA sample by swabbing defendant's mouth. Defendant's DNA was then matched by Missouri law enforcement officials with DNA from the ski mask in the robbery case and, subsequently, with DNA from another Missouri case involving a home invasion and sexual assault.

Later in 2003, Missouri police, who had defendant in custody, noticed that defendant had a Colorado arrest record, and they contacted the Denver police. Following this contact, Missouri police forwarded defendant's DNA profile to the Denver police. Colorado law enforcement officials were able to obtain a match of defendant's DNA profile from the sample taken in Missouri to the sample retrieved as evidence from the December 4, 1999 sexual assault. Defendant was then charged in this case.

After defendant was returned to Colorado, the Denver police obtained a saliva sample from defendant. The DNA profile from that sample was then matched again with the DNA profile of the suspect from K.D.'s rape kit.

Prior to trial in this case, defendant filed a motion to suppress all DNA evidence obtained as a result of an unconstitutional search and seizure of his saliva by Missouri law enforcement authorities in February 2003. After an evidentiary hearing, the trial court denied defendant's motion.

A jury found defendant guilty on counts of second degree kidnapping, first degree sexual assault, and attempted aggravated robbery. The trial court sentenced defendant to forty-eight years on the kidnapping charge, thirty-two years to life on the sexual assault charge, and eight years on the attempted aggravated robbery charge, all to run consecutively. This appeal followed.

## II. Motion to Suppress

Defendant first contends that the trial court erred in denying his motion to suppress all evidence obtained as a result of a warrantless search, namely, the collection of his saliva and DNA in Missouri in February 2003. Specifically, defendant contends that (1) he did not voluntarily consent to the taking of his DNA in Missouri that was used to match his DNA to the evidence obtained in this case, and (2) any consent he gave to providing the DNA in Missouri was limited to the robbery charge there, and was not valid as to other offenses, including those charged in this case. We disagree and reject each of these contentions in turn.

We review the trial court's decision on a motion to suppress evidence as a mixed question of fact and law. *People v. Davis,* 187 P.3d 562, 563–64 (Colo.2008). We defer to the trial court's factual findings if the record supports them, and review the trial court's conclusions of law de novo, taking into consideration the totality of the circumstances. *Id.*

### A. Voluntariness

Defendant first contends that he did not voluntarily consent to the taking of the DNA sample in Missouri. Defendant concedes that no government official applied any physical coercion, threat, or promise to obtain a sample of his DNA. Rather, he argues that his consent was not voluntary because Missouri law enforcement officials did not expressly advise him that his DNA would be used for purposes other than determining whether his DNA matched DNA associated with the Missouri robbery charge. We disagree.

Both the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit warrantless searches and seizures of one's person or property. *People v. Reddersen,* 992 P.2d 1176, 1181 (Colo.2000). "If a subject voluntarily consents to a search, however, a warrantless search does not violate those constitutional rights...." *Id.; see People v. Magallanes–Aragon,* 948 P.2d 528, 530 (Colo.1997).

A defendant's consent to a search is considered voluntary when it is " 'the product of an essentially free and unconstrained choice by its maker' and not the result of circumstances where the subject's will has been overborne and [his or] her capacity for self-determination critically impaired." *Reddersen,* 992 P.2d at 1181 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). A consensual search is involuntary when it is the result of duress or coercion, express or implied, or any other form of undue influence against the defendant, including promises, threats, and intrusive police conduct. *Reddersen,* 992 P.2d at 1181; *Magallanes–Ara-*

*gon,* 948 P.2d at 531. A trial court must first determine "whether there is objective evidence of coercion, duress, deception, promises, threats, intrusive conduct or other undue influence by the police, which critically impaired the defendant's judgment." *Reddersen,* 992 P.2d at 1182. Then, the court must "decide whether the police conduct could reasonably have appeared to be coercive to a person in the defendant's circumstances." *Id.*

■ The voluntariness of a consent to search is a question of fact to be determined by the trial court. We must defer to the trial court's findings of fact unless those findings are clearly erroneous or find no support in the record. *Id.*

Here, at the suppression hearing, the prosecutor from the Missouri robbery case testified at length regarding the circumstances under which defendant provided his saliva sample in Missouri in February 2003. Specifically, she testified that, prior to the hearing on her motion to compel, defendant verbally consented to providing a DNA sample; that defendant never withdrew that consent; and that, in accordance with Missouri's procedure, she then advised the court of defendant's consent and withdrew her motion to compel. There is no evidence in the record that defendant limited his consent in any way. The prosecutor also testified that the sample given by defendant was placed in a "local database" and later matched with the DNA from the ski mask in the robbery case and from a Missouri "cold case" involving the home invasion and sexual assault, and that defendant did not contest the validity of his consent in either of those cases.

The Missouri prosecutor acknowledged that defendant was not expressly informed by Missouri officials that his saliva sample would be retained by the police, entered into DNA databases, or could be used for purposes other than the pending Missouri robbery case. In that regard, the following exchange took place on cross-examination of the Missouri prosecutor:

Q. So there was no indication that it was going to be used for anything else?

A. That's an incorrect statement. We had no other investigations on Mr. Collins.

He was not suspected in any other case. But upon the taking of DNA sample and testing done by the criminalist, it will be entered into the database. And then as it is in that database, it will go through the local database, a local state database and a national database. When you have a sample, it's run against other samples[,] unsolved samples and known samples.

Q. That's procedurally what you guys do?

A. I don't do that. That's the job of the criminalist.

Q. But that's a process that's done outside of the defendant's presence or knowledge?

A. I believe that's a process that's done outside the defendant's presence. I don't know about his knowledge. But it's a matter of practice in all jurisdictions.

The trial court denied defendant's motion to suppress, analogizing the situation here to a defendant's consent to fingerprinting when the fingerprint evidence is retained and used in other cases. Specifically, the court ruled as follows:

Here the evidence is that Mr. Collins consented to give a sample of I guess it was saliva. But he consented to the sample that was subsequently used in this case to identify him as a suspect and there was no indication that he reasonably expected any limitations upon the use of that or limiting it to just the case from which it was taken.

And again if you analogize like fingerprints, I can't infer that whether a defendant gives consent, he's thinking it's only going to be used for that case only. There is no reason to testify—there is no evidence in any event that he had that expectation.

On appeal, defendant argues that the failure of Missouri authorities "to inform [him] that he was providing incriminating evidence that would be used not only for comparison with evidence in the robbery case, but would also be placed on local and national databases and compared with unsolved crimes was a form of undue influence that invalidated his consent." We are not persuaded.

Although this is an issue of first impression in Colorado, courts in other states have consistently ruled contrary to defendant's contention here.

For example, in *Pace v. State,* 271 Ga. 829, 524 S.E.2d 490 (1999), a suspect agreed to give police a DNA sample for the investigation of one murder. *Id.* at 497. Although police found that the DNA sample did not match the DNA from that murder, the suspect's DNA matched DNA found at the scenes of four other murders. *Id.* The Supreme Court of Georgia concluded that the defendant, like defendant here, was not subject to any threat, coercion, or other undue police influence, *id.* at 498, and that, even though the defendant in *Pace* was not explicitly informed that his DNA might be used in other investigations, under the totality of the circumstances, his consent was voluntary. *Id.* Specifically, the court ruled as follows:

> The police were not required to explain to [the defendant] that his blood or hair could be used in prosecutions involving other victims.... Further, like a fingerprint, DNA remains the same no matter how many times blood is drawn and tested and a DNA profile can be used to inculpate or exculpate suspects in other investigations without additional invasive procedures. It would not be reasonable to require law enforcement personnel to obtain additional consent or another search warrant every time a validly-obtained DNA profile is used for comparison in another investigation.

*Id.* at 498 (citations omitted).

The Massachusetts Supreme Judicial Court reached the same conclusion on similar facts in *Commonwealth v. Gaynor,* 443 Mass. 245, 820 N.E.2d 233, 243 (2005), where the court held that a defendant's consent to DNA identification is not involuntary merely because the defendant is not informed that the identification will be used in other investigations.

And in *Wyche v. State,* 987 So.2d 23 (Fla. 2008), the Supreme Court of Florida also ruled:

> [W]hen a defendant validly consents to the giving of the bodily substance, whether saliva, hair, or blood, for use in a criminal investigation, the characteristics of the substance can be used in investigations unrelated to the one for which the defendant was told the sample was collected. This holding is logical because the DNA profile derived from a bodily substance like saliva, hair, or blood is a constant identifying fact that does not change or disappear.

*Id.* at 27 (citing *Washington v. State,* 653 So.2d 362, 364 (Fla.1994)); *cf. Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (holding "that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege"). Indeed, in *Wyche,* the court found the defendant's consent voluntary even though the police had created a fictitious burglary investigation as the stated purpose for obtaining the defendant's consent to the taking of saliva swabs.

We find the reasoning in these cases persuasive and similarly conclude that, under the totality of the circumstances here, defendant's consent was not rendered involuntary merely because the Missouri authorities did not expressly inform him that his DNA sample might be used to implicate him in other crimes. There is no objective evidence in the record here that the Missouri police or the prosecutor made any express or implied representations to defendant that his DNA profile would be used solely for comparison with the evidence found in the Missouri robbery case. *See Gaynor,* 820 N.E.2d at 243 (police made no express representation that the results of the defendant's blood tests would be used solely for comparison to the tests on blood found in one victim's car). Nor is there any evidence in the record that defendant himself placed any limitations on his consent. *See Pace,* 524 S.E.2d at 498. Finally, there is no evidence that the police or the prosecutor used any deception in obtaining defendant's consent. *See Gaynor,* 820 N.E.2d at 242. We thus conclude that, under the totality of the circumstances here, the conduct of the Missouri authorities could not "reasonably have appeared to be coercive to a person in ... defendant's circumstances." *Reddersen,* 992 P.2d at 1182.

Defendant's reliance on *State v. Gerace,* 210 Ga.App. 874, 437 S.E.2d 862, 862–63 (1993), is misplaced. Unlike the situation here, that case involved blood taken pursuant to Georgia's implied consent statute, which specifically authorizes the taking of blood samples to determine whether a driver is impaired by drugs or alcohol. Indeed, in *Pace,* the Georgia Supreme Court expressly distinguished *Gerace* on this very basis, noting that Georgia's implied consent statute "limits the purpose of the testing to a determination of whether the driver is under the influence of alcohol or drugs." *Pace,* 524 S.E.2d at 498. In contrast, the defendant in *Pace,* like defendant here, did not limit his consent in any way.

Accordingly, we conclude the trial court did not err in denying defendant's motion to suppress on the ground that his consent was involuntary.

### B. Scope of Consent

■ Alternatively, defendant contends that even if his consent was voluntary, it was nevertheless "limited to use of the sample for comparison only with evidence from the pending robbery case" in Missouri. Thus, he claims Missouri officials exceeded the scope of his consent when they shared his DNA profile with Colorado authorities. We are not persuaded.

■ A warrantless search conducted on the basis of consent is limited by the terms given by the consenting party. *People v. Dumas,* 955 P.2d 60, 62 (Colo.1998). Whether a search remained within the boundaries of the consent is a factual question to be determined from the totality of the circumstances. *Id.* The scope of consent is measured by a test of "objective reasonableness." *People v. Najjar,* 984 P.2d 592, 596 (Colo.1999); *Dumas,* 955 P.2d at 63. In other words, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Najjar,* 984 P.2d at 596 (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)); *see Gaynor,* 820 N.E.2d at 244.

In rejecting defendant's argument here, we are persuaded by the following reasoning of the Massachusetts court in *Gaynor:*

> "The standard for measuring the scope of a suspect's consent under the Fourth Amendment [to the United States Constitution] is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" The scope of consent is ordinarily understood to refer to the scope of the search, and is defined by the areas, objects or things for which consent is given.
>
> Here, a reasonable person likely would have concluded that police were seeking the defendant's blood tests results, including his DNA profile. The object of the intended search was a sample of the defendant's blood and the identifying information that could be obtained by DNA testing of the sample. The testing actually done on the defendant's blood sample was no more intense or intrusive of his privacy interests than what was expressly sought. The scope of the search, blood tests, was confined to what a reasonable person would have understood from the request by police.
>
> Contrary to the defendant's claim, the scope or object of the intended search was not the investigation into the disappearance of the fourth victim, which police had mentioned. Their statement about that investigation may have been relevant to the voluntariness of the defendant's consent, but in this case it did not define the scope of his consent. . . .
>
> Although it is a suspect's right to limit the scope of a search to which he consents, the defendant did not avail himself of that right.

*Gaynor,* 820 N.E.2d at 244 (quoting *Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801) (citations omitted); *see also State v. Notti,* 316 Mont. 345, 71 P.3d 1233, 1237–38 (2003) (concluding that a defendant's privacy and Fourth Amendment rights are waived when the defendant consents to a blood draw and DNA profile in one case and the DNA profile is then used for comparison purposes in another unrelated case).

Here, as in *Gaynor,* there is no evidence in the record that defendant limited the scope of his consent in any way, much less to the use of his DNA profile only for the Missouri robbery case. Although the original motion to compel filed by the Missouri prosecutor referenced that case (which was the only case pending against defendant at that time), the DNA sample taken from defendant was not obtained pursuant to a court order on that motion. Rather, defendant voluntarily consented to the taking of his saliva and did not limit his consent in any way. Further, the scope of the actual search here, as consented to by defendant, was limited to its intended object, namely, a sample of defendant's saliva for DNA testing. *Gaynor,* 820 N.E.2d at 244; *see People v. Olivas,* 859 P.2d 211, 214 (Colo.1993) ("The scope of a warrantless search is generally defined by its expressed object, and a consensual search may not legally exceed the scope of the consent supporting it." (citation omitted)).

Thus, we conclude that the typical reasonable person in defendant's place would have understood that the DNA sample taken from him and the data obtained from analysis of the sample would remain in possession of law enforcement and be available for future law enforcement uses. In our view, no reasonable person would believe that, absent some express limitation by the defendant, the police would be limited in their use of the DNA sample to the crime then under investigation.

We therefore conclude the trial court did not err in denying defendant's motion to suppress on the ground that the scope of his consent was exceeded.

Because of our resolution of this issue, we need not address the People's remaining arguments based on the inevitable discovery doctrine or the purposes of the exclusionary rule.

### III. Juror Challenges for Cause

Defendant next contends that the trial court erred when it denied his challenges for cause to two prospective jurors, Juror L and Juror G. We perceive no reversible error.

#### A. Juror L

With respect to Juror L, we agree with the People that we need not consider this issue, because the prosecution used a peremptory challenge to excuse this juror. *See People v. Rubio,* 222 P.3d 355, 362 (Colo.App.2009) (*cert. granted* Jan. 11, 2010) (concluding a defendant is not harmed by a trial court's refusal of his for-cause challenge when the prosecutor uses a peremptory challenge to remove the juror); *see also People v. Marquantte,* 923 P.2d 180, 184 (Colo.App.1995).

#### B. Juror G

During voir dire, prospective Juror G had the following colloquy with defendant's counsel:

Counsel: You go back in the jury room, Ms. [G] . . . if you are selected, and do you feel that everyone in the room deserves your respect?

Juror G: All the jury members?

Counsel: Yes, ma'am.

Juror G: Not necessarily.

Counsel: Well, what if you don't agree with their opinion, are you . . . going to let them know?

Juror G: Possibly.

Counsel: Why wouldn't you let them know if you disagree with them?

Juror G: What I meant is I don't expect everybody to think the same way I do. I would probably tell them I saw it a different way. . . .

Counsel: . . . If you are chosen, you go back there, you are saying, if I disagree I am going to let them know, right, because you are entitled to the same respect as everyone else sitting in the room deliberating, aren't you?

Juror G: Yes. . . .

Counsel: I don't want the answer you think I want. I want the answer that is [in] your mind.

Juror G: Well, I don't think I am a juror to be respected by everyone, if you are trying to figure out about other people.

Counsel: Well, what I am talking about, ladies and gentlemen, is respect. You go back there, and you feel you don't have as

much knowledge as other people, do you feel your opinion doesn't count as much? Ms. [G]?

Juror G: If the subject [is] DNA, very possibly. I don't know anything about it and some of the other scientists do.

Counsel: Let's say they go back there and their opinion might be that it is absolutely correct, but there is something else you observed that made you concerned, would you advi[s]e them of that opinion?

Juror G: I think so so. [sic]

Counsel: Or would you say, they know what they are talking about, so my concern must be silly. These are tough questions, aren't they?

Juror G: Yes they are, and I have to [admit], but whatever. I am tired.

Defendant's counsel then moved to challenge prospective Juror G for cause, arguing "she really shut down and stopped giving answers." Defendant's counsel also argued that "she would give in to other jurors, because she felt she was not respected."

The trial court denied defendant's challenge for cause, specifically finding as follows:

I think [prospective Juror G] had difficulty with the form of the question. I am not sure she always understood, but it was clear from her responses that she understood that [the jurors] shouldn't always agree, and her opinion was as important as anyone else's. I did not hear her say she would just cave in to someone else.

Defendant subsequently used a peremptory challenge to excuse prospective Juror G and otherwise exhausted his peremptory challenges.

The Due Process Clauses of the United States and Colorado Constitutions guarantee all criminal defendants the right to an impartial jury trial. *People v. Dahl*, 160 P.3d 301, 304 (Colo.App.2007). To ensure this right, the trial court must excuse jurors who are biased or prejudiced. *People v. Young*, 16 P.3d 821, 824 (Colo.2001). A jury's verdict must be unanimous, and "[u]nanimity requires a free and untrammeled deliberative process that expresses the conscientious conviction of each individual ju-

ror." *People v. Lewis*, 676 P.2d 682, 686 (Colo.1984). Nevertheless, if "the trial court is satisfied that the juror will issue an impartial verdict, the juror should not be dismissed for cause." *Young*, 16 P.3d at 824.

We review a trial court's ruling on a challenge for cause for abuse of discretion. *Carrillo v. People*, 974 P.2d 478, 485–86 (Colo.1999). If a trial court erroneously denies a challenge for cause to a prospective juror, the defendant uses a peremptory challenge to remove that juror, and the defendant exhausts all available peremptory challenges, the trial court's ruling affects a substantial right of the defendant and cannot be deemed harmless error. *Id.* at 486–87. However, this standard of review also recognizes that the trial court, because it can evaluate the demeanor and body language of prospective jurors, is in a "superior position" to determine whether a juror can be impartial. *Young*, 16 P.3d at 824. Accordingly, we will reverse the trial court's decision only when the evidence in the record does not support the trial court's conclusion. *People v. Richardson*, 58 P.3d 1039, 1042 (Colo.App.2002).

Here, the record supports the trial court's explicit factual finding that prospective Juror G would express her convictions and opinions during deliberations. She stated that she would tell the other jurors if she "saw it a different way," and that she would advise the other jurors of her opinion. Further, prospective Juror G never indicated she could not render a fair and impartial verdict based on the evidence presented and the applicable law. In our view, based on this record, the trial court reasonably concluded that prospective Juror G met the requirements to serve on the jury. Thus, we conclude the trial court did not abuse its discretion in denying defendant's challenge to Juror G.

## IV. Prosecutorial Misconduct

Defendant contends the prosecutor committed reversible misconduct when she improperly described defense counsel's theory of reasonable doubt as "absurd." We con-

clude that the prosecutor's comment was not improper.

The prosecutor made the allegedly improper remark during her rebuttal closing argument. Much of defendant's theory of the case, as articulated in defense counsel's closing argument, was that the prosecution had not proved beyond a reasonable doubt that defendant committed the charged crimes. Specifically, defendant's counsel attacked the prosecution's case on the basis of the reliability of the science underlying DNA identification, contamination of the DNA samples, and the fact that defendant's DNA profile matched only twelve of thirteen locations in the standard profile.

In her rebuttal argument, the prosecutor responded by remarking on defendant's theory as follows: "Counsel talks a lot about reasonable doubt. What she is asking you to do is find an unreasonable doubt. It is absurd." Defendant objected, and the trial court overruled the objection without comment.

A trial court has broad discretion to determine whether "a prosecutor's statements constitute inappropriate prosecutorial argument." *Harris v. People*, 888 P.2d 259, 265 (Colo.1995). Therefore, we review the trial court's decision on the propriety of prosecutorial argument for an abuse of discretion. *People v. Mandez*, 997 P.2d 1254, 1269 (Colo. App.1999).

The United States and Colorado Constitutions guarantee criminal defendants the right to a trial by a fair and impartial jury. U.S. Const. amend. VI; Colo. Const. art. II, §§ 16, 23; *Harris*, 888 P.2d at 263. Prosecutorial argument is improper when it is "calculated to inflame the passions or prejudices of the jury" because such argument can lead the jury to render a decision that is unfair or biased. *Harris*, 888 P.2d at 264. Likewise, prosecutorial argument is improper when it "encourage[s] jurors to retaliate against [the] defendant." *Id.* A prosecutor may not state his or her own belief in the guilt of a defendant. *People v. Jones*, 832 P.2d 1036, 1039 (Colo.App.1991); *People v. Foster*, 971 P.2d 1082, 1086 (Colo.App.1998). Nor may a prosecutor state or imply that

defense counsel has presented the defendant's case in bad faith or otherwise make remarks for the purpose of denigrating defense counsel. *Jones*, 832 P.2d at 1039.

Instead, a prosecutor's arguments must be "restricted to the evidence and reasonable inferences to be drawn therefrom on the issue of whether guilt is proved beyond a reasonable doubt." *Harris*, 888 P.2d at 264 (quoting *People v. Ferrell*, 200 Colo. 128, 131, 613 P.2d 324, 326 (1980)). In that regard, a prosecutor may "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance, so long as [the argument] does not thereby induce the jury to determine guilt on the basis of passion or prejudice." *People v. Allee*, 77 P.3d 831, 837 (Colo.App.2003). Thus, a prosecutor has considerable latitude in replying to opposing counsel's argument, and "[c]ontentions of improper argument in a closing argument must be evaluated in 'the context of the argument as a whole and in light of the evidence.'" *Marquantte*, 923 P.2d at 185 (quoting *People v. Gutierrez*, 622 P.2d 547, 554 (Colo.1981)).

Here, we conclude that the trial court did not abuse its discretion in overruling defendant's objection to the prosecutor's remark during rebuttal closing argument. Taken in context, the record shows that the remark was not a personal attack on defense counsel. Rather, the record reveals that the prosecutor's remark was merely a response to defense counsel's assertions that the jury could not find defendant guilty beyond a reasonable doubt. The prosecutor's statement did nothing more than suggest to the jury that defendant's theory as to why the jury should find a reasonable doubt was so unlikely as to strain credibility. Indeed, after stating that defendant's theory was "absurd," the prosecutor then explained to the jury how, according to the evidence at trial, the DNA identification was still such a precise match that only one in 300 trillion people would match 12 of the 13 markers. Thus, the record shows that the prosecutor's comment permissibly focused the jury's attention on the evidence and the inferences that could be reasonably drawn from the evidence. *See Harris*, 888 P.2d at 263–64.

In our view, the record amply demonstrates that the prosecutor's comment did not induce the jury to make a decision on a basis other than the merits of the evidence and the court's instructions of law.

Accordingly, we conclude the trial court did not abuse its discretion in overruling defendant's objection.

### V. Constitutionality of Sex Offender Lifetime Supervision Act

Finally, defendant contends that the Sex Offender Lifetime Supervision Act of 1998 (the Act), §§ 18-1.3-1001 to -1012, C.R.S. 2009, is unconstitutional on several grounds. Defendant concedes that he did not raise this issue in the trial court. Thus, on appeal, we need not consider defendant's constitutional challenges to the Act. *People v. Cagle,* 751 P.2d 614, 619 (Colo.1988).

Nevertheless, several divisions of this court have already addressed the precise constitutional challenges that defendant raises here, and those divisions have all concluded that the Act is constitutional. *See People v. Lehmkuhl,* 117 P.3d 98, 108 (Colo.App. 2004); *People v. Dash,* 104 P.3d 286, 290–92 (Colo.App.2004); *People v. Oglethorpe,* 87 P.3d 129, 133–36 (Colo.App.2003); *People v. Strean,* 74 P.3d 387, 393 (Colo.App.2002). We see no reason to reconsider or depart from the holdings and reasoning of these cases.

The judgment and sentence are affirmed.

Judge CARPARELLI and Judge BERNARD concur.