The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
February 11, 2021

## 2021COA14

**No. 18CA1879, *People v. Marston* — Crimes — DWAI;
Evidence — Admissibility**

A division of the court of appeals holds that a trial court may

admit evidence of the results of a horizontal gaze nystagmus test

given to a motorist without first holding a *Shreck* hearing, if the

evidence is offered only as evidence of impairment and if the

witness testifying about the administration and the results of the

test is competent to give such testimony.

COLORADO COURT OF APPEALS                                    2021COA14

Court of Appeals No. 18CA1879
Jefferson County District Court No. 16CR2934
Honorable Tamara S. Russell, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Shawn Patrick Marston,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE J. JONES
Welling and Gomez, JJ., concur

Announced February 11, 2021

Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith E. O'Harris, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Shawn Patrick Marston, appeals the judgment of conviction entered on a jury verdict finding him guilty of driving while ability impaired (DWAI). One of the issues he raises is whether the district court was required to hold a *Shreck* hearing, *see People v. Shreck*, 22 P.3d 68 (Colo. 2001), before allowing a police officer to testify about the results of a horizontal gaze nystagmus (HGN) test the officer administered to him immediately before he was arrested. We previously issued an opinion holding that no such hearing was required; the results of such a test are generally admissible, if relevant, as evidence of impairment, so long as the person testifying about the administration and results of the test is competent to give such testimony. The officer in this case was, so the court didn't err by allowing the officer's testimony. *People v. Marston*, 2020 COA 121. We also rejected Marston's other challenges to the judgment, including his contention that the district court erred by finding by a preponderance of the evidence that he had at least three prior alcohol-related driving convictions rather than submitting that issue to the jury for it to decide beyond a reasonable doubt.

¶ 2    The supreme court vacated our opinion and remanded the case for reconsideration in light of its decision in *Linnebur v. People*, 2020 CO 79M. *Marston v. People*, (Colo. No. 20SC695, Jan. 11, 2021) (unpublished order).  In *Linnebur*, the supreme court held that the requirement of three or more prior qualifying offenses is an element of felony DWAI that must be found by a jury beyond a reasonable doubt.  *Linnebur*, ¶¶ 2, 31.  Following *Linnebur*, we reverse Marston's conviction for felony DWAI and remand for further proceedings consistent with this opinion.  We once again address Marston's other contentions, however, because they bear on whether a conviction for misdemeanor DWAI can stand and would arise in the event of any retrial for felony DWAI.

I.    Background

¶ 3    Shortly before noon one day, J.P. was driving behind a red truck when he saw the truck straddling lanes and speeding up and slowing down erratically.  He also saw the driver nodding off at the wheel.  J.P. called 911 and followed the truck to a 7-Eleven.  Marston got out of the truck and went into the 7-Eleven, at which point J.P. approached a Jefferson County Sheriff's deputy — Deputy Aaron Fosler — who had just pulled into the parking lot.

2

J.P. told Deputy Fosler what he had seen. Deputy Fosler followed Marston into the 7-Eleven.

¶ 4    Deputy Fosler asked Marston to step outside the convenience store and answer some questions. Marston obliged. As Deputy Fosler held the door open and Marston walked out, he saw that Marston was "staggering, grabbing something to hold onto." Outside, Deputy Fosler questioned Marston about his driving and whether he had been drinking. Marston told him that his driver's license was suspended, told the officer he had driven to the 7-Eleven but then said his girlfriend had driven him there, and told the officer he had downed several "mixed drinks" the night before at his girlfriend's house. Unprompted, Marston asked Deputy Fosler if there was any way to keep his truck from being towed if he was taken to jail. Throughout this conversation, Deputy Fosler noticed that Marston's eyes were red and watery, he smelled of alcohol, and his speech was "thick tongued."[1]

---

[1] Sometime during this conversation, a second deputy arrived and, for part of the time, stood nearby. That officer also noticed Marston's signs of intoxication.

¶ 5    Based on Marston's statements and Deputy Fosler's observations, Deputy Fosler called for another officer, Deputy Kevin Kehl, to administer roadside field sobriety tests. Kehl did so. One such test was the HGN test. As discussed more fully below, that test requires the subject to follow an object (for example, a pen) with his eyes to the left and right. The person administering the test must watch the subject's eyes to detect any involuntary "jerking" of his eyeballs.

¶ 6    At one point during the roadside tests, when Deputy Kehl was demonstrating a walk-and-turn maneuver, Marston said, "I couldn't do that sober." Deputy Kehl determined that Marston didn't perform as a sober person would on the HGN test and the other roadside tests and arrested him. Marston refused to take a chemical test.

¶ 7    After Marston's girlfriend picked up the truck from the 7-Eleven, she found bottles of vodka in the back of the truck. She testified at trial that, contrary to what Marston had told Deputy Fosler, she wasn't with Marston the night before the arrest and in fact hadn't seen him in several weeks.

¶ 8     The People charged Marston with driving under the influence (DUI) and driving under restraint.  Marston went to trial on the DUI charge.  The jury ultimately convicted him of the lesser included DWAI offense.  The court then determined that Marston had at least three prior alcohol-related driving convictions and sentenced him for felony DWAI.  *See* § 42-4-1301(1)(b), C.R.S. 2020.

## II.     Discussion

¶ 9     Marston contends that the district court erred by (1) determining that he had three prior alcohol-related driving convictions by a preponderance of the evidence rather than having the jury determine those convictions as elements that must be proven beyond a reasonable doubt; (2) denying his motion to suppress his statements to Deputy Fosler at the scene; and (3) denying his request for a *Shreck* hearing on (a) the reliability of the HGN test and (b) Deputy Kehl's expertise.  We address each contention in turn.

### A.     Prior Convictions

¶ 10     Marston contends that the district court erred by finding that he had at least three prior alcohol-related driving convictions by a preponderance of the evidence rather than submitting the issue to

the jury for it to decide beyond a reasonable doubt. He argues that the prior convictions are elements of the crime. As noted, *Linnebur* so holds. And it requires that we reverse Marston's DWAI conviction. On remand, the People may elect to retry Marston on the felony charge, and if Marston raises a double jeopardy objection the district court should address it. *Linnebur*, ¶ 32. If the People choose not to retry Marston on the felony charge, the district court should, given our rejection below of Marston's other contentions of error, enter a conviction for misdemeanor DWAI. *Id.*

## B. Marston's Statements to Police

¶ 11    Marston next contends that his statements to Deputy Fosler at the scene should have been suppressed because they were involuntary.[2] If Marston is correct, any conviction for DWAI would be thrown into doubt. And the issue may arise on remand. Therefore, we address it.

---

[2] Marston's motion didn't specify what statements he wanted suppressed. At the suppression hearing, Marston's attorney said she was challenging "everything at the scene." But on appeal, Marston only challenges the voluntariness of his statements to Deputy Fosler.

## 1.    Standard of Review

¶ 12    "A trial court's suppression ruling presents a mixed question of fact and law." *People v. Ramadon*, 2013 CO 68, ¶ 21.  We won't overturn the trial court's factual findings if they are supported by competent evidence in the record; however, we review the legal effect of those facts de novo.  *Id.*; *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010) ("[T]he ultimate determination of whether a statement is voluntary is a legal question and is reviewed de novo.").  And we review any error under the constitutional harmless error standard; that is, we reverse unless the People show that the error was harmless beyond a reasonable doubt.  *Hagos v. People*, 2012 CO 63, ¶ 11.

## 2.    Applicable Law

¶ 13    "[A] defendant's statements must be voluntary to be admissible as evidence." *Ramadon*, ¶ 18.  In determining whether a defendant's statements were voluntary, we "must consider the totality of the circumstances 'to determine whether the accused's will was actually overborne by coercive police conduct.'" *People v. Coke*, 2020 CO 28, ¶ 18 (quoting *Sanchez v. People*, 2014 CO 56, ¶ 11).  To do so, we engage in a two-step inquiry: we first look to

whether the police conduct was coercive; if so, we then look to whether that conduct "played a significant role in inducing the statements." *Ramadon*, ¶ 20. The statements "must not be the product of any direct or implied promises, nor obtained by exerting an improper influence." *People v. Medina*, 25 P.3d 1216, 1222 (Colo. 2001).

¶ 14    To determine whether the police conduct was coercive, we may consider, among other things, the following factors:

> (1) whether the defendant was in custody;
> (2) whether the defendant was free to leave;
> (3) whether the defendant was aware of the situation;
> (4) whether the police read *Miranda* rights to the defendant;
> (5) whether the defendant understood and waived *Miranda* rights;
> (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
> (7) whether the statement was made during the interrogation or volunteered later;
> (8) whether the police threatened [the] defendant or promised anything directly or impliedly;
> (9) the method or style of the interrogation;
> (10) the defendant's mental and physical condition just prior to the interrogation;
> (11) the length of the interrogation;
> (12) the location of the interrogation; and
> (13) the physical conditions of the location where the interrogation occurred.

*Ramadon,* ¶ 20 (quoting *Medina,* 25 P.3d at 1222-23).

### 3. Analysis

¶ 15    We agree with the district court's determination that Marston's will wasn't overborne by coercive police conduct and that his statements were therefore voluntary. The following facts, almost all of which are undisputed, lead us to this conclusion:

- Deputy Fosler asked Marston if he wouldn't mind stepping outside and answering some questions; he didn't order him to do so. Marston agreed.

- No officer made any threats or promises to Marston.

- The encounter occurred outside, in a public place.

- Marston seemed be aware of the situation. (He had been in this situation several times before.) For example, unprompted, he asked if there was any way he could prevent his truck from being towed if he was taken to jail.

- Marston appeared to understand Deputy Fosler's questions and gave responsive answers.

- Marston wasn't restrained in any way and hadn't yet been taken into custody.

- Deputy Fosler used a conversational tone.

- The deputies didn't use any subtle psychological pressure to get Marston to talk.

¶ 16    Marston asserts that his statements were coerced because more than one deputy was present, the two deputies stood close to him, the encounter lasted twenty to thirty minutes, he wasn't given a *Miranda* advisement, and he wasn't free to leave.  But looking at the totality of the circumstances, as we must, *see Coke*, ¶ 18, we conclude that these facts don't add up to coercion.

¶ 17    *People v. Zadran*, 2013 CO 69M, presents an instructive comparison.  In that case, the supreme court determined that the police officer's statements to the defendant — "I think it would be in your best interest to talk to me," "I think you are going to be interested in some of the things that I already know," "It is what it is.  You messed up.  You know you messed up," and "You want to get ahead of this.  You want to make things right.  You want a positive outcome from this.  I'm trying to do the [least] invasive thing that I can do here" — didn't show police coercion.  And this even though the defendant was in custody and wasn't free to leave. *Id.* at ¶¶ 15-19.  The court contrasted the facts before it with those

in cases in which the police exploited a defendant's "particular set of vulnerabilities." *Id.* at ¶¶ 17-18.

¶ 18    In terms of showing coercion, the facts of this case don't even approach those in *Zadran,* in which the court found no coercion. Deputy Fosler simply asked Marston, in a conversational tone, questions about his driving and alcohol consumption. We see no indication that Marston's will was overborne by coercive police conduct.

## C.    Denial of a *Shreck* Hearing

¶ 19    Next, Marston contends that the district court erred by refusing to hold a *Shreck* hearing on the science, reliability, and margin of error of the HGN test, as well as Deputy Kehl's expertise on those issues. We address this issue for the same reasons we address Marston's contention that his statements to the police weren't admissible. We conclude that the district court didn't err by denying Marston a hearing, but that even if it did, any error was harmless.

### 1.    The District Court's Ruling

¶ 20    After the prosecution endorsed Deputy Kehl as an expert in HGN testing, Marston filed a motion requesting a *Shreck* hearing to

challenge the admissibility of the HGN test and Deputy Kehl's qualifications as an expert. In response, the prosecution argued that a hearing wasn't necessary, citing district court cases from Colorado and appellate court cases from other jurisdictions in which HGN testing had been found "reasonably reliable" and accepted by the scientific community. At a motions hearing, the district court heard argument from both sides as to why a *Shreck* hearing was or wasn't necessary. It ultimately found that "the scientific community has accepted over many years the fact that the HGN is a reliable and relevant tool to help police officers determine if someone is under the influence of alcohol," and concluded that the science was reliable and that if the prosecution properly qualified Deputy Kehl as an expert, his testimony would be useful to the jury.

## 2. Standard of Review

¶ 21 We review a district court's denial of a request for a *Shreck* hearing for an abuse of discretion. *See People v. Rector*, 248 P.3d 1196, 1201 (Colo. 2011) ("Once a party requests a *Shreck* analysis, a trial court is vested with the discretion to decide whether an evidentiary hearing would aid the court in its *Shreck* analysis."). "A

12

trial court abuses its discretion only if its decision is manifestly arbitrary, unreasonable, [or] unfair, or is based on a misunderstanding or misapplication of the law." *People v. Thompson*, 2017 COA 5, ¶ 91. And "we review any error in denying a *Shreck* hearing under the nonconstitutional harmless error standard." *People v. Wilson*, 2013 COA 75, ¶ 24; *cf. Campbell v. People*, 2019 CO 66, ¶ 34 (error in allowing officer to testify as a lay witness regarding HGN reviewed for nonconstitutional harmless error). We therefore reverse only if any error substantially influenced the verdict or impaired the fairness of the trial. *Wilson*, ¶ 24.

### 3.     Analysis

¶ 22     To decide whether the district court abused its discretion by allowing Deputy Kehl to testify about Marston's performance on the HGN test without first holding a *Shreck* hearing, we proceed in the following steps. First, we discuss the nature of the test and its use in Colorado courts. Second, we discuss *Shreck*'s admissibility framework. Third, we assess whether there is sufficient indication that the HGN test satisfies *Shreck*'s admissibility test, or whether a *Shreck* hearing was required.

13

### a. The HGN Test

¶ 23    The HGN test measures the subject's ability to maintain visual fixation on an object as his eyes move from side to side. Nat'l Traffic L. Ctr., Am. Prosecutors Rsch. Inst., *Horizontal Gaze Nystagmus: The Science and the Law* (n.d.), https://perma.cc/UW93-GHPD. ("Nystagmus" is a rapid, involuntary oscillation of the eyeballs.) An officer holds an object (a pen, small flashlight, or finger) about twelve to fifteen inches in front of a subject's nose. The officer asks the subject to remove any glasses, to stand still with his feet together and hands at his sides, and to focus on the object. The officer then moves the object slowly back and forth horizontally three times, observing whether each of the subject's eyes smoothly tracks the object. Continuing Legal Education in Colorado, Inc., *Colorado DUI Benchbook* § 6.2.2 (2019-2020 ed.); *see also* Am. Prosecutors Rsch. Inst., *Admissibility of Horizontal Gaze Nystagmus Evidence* 5 (2003), https://perma.cc/R36W-CCXR. The officer looks for three testing points for each eye (six total): lack of smooth pursuit, distinct jerking of the eyes at maximum deviation, and jerking that occurs before a forty-five-degree angle. Nat'l Highway Traffic Safety

Admin., *DWI Detection and Standardized Field Sobriety Test (SFST) Participant Manual* Session 7, page 9 of 39 (rev. Feb. 2018), https://perma.cc/4R6E-ZB3A; *see State v. Baue,* 607 N.W.2d 191, 201-02 (Neb. 2000) (describing the test).  If four or more of these clues are present, the subject's blood alcohol content (BAC) is likely at or above 0.08%.  *DWI Detection* at Session 8, page 37 of 95; *Baue,* 607 N.W.2d at 202.

¶ 24     The National Highway Traffic Safety Administration (NHTSA) standardized the HGN test along with the walk-and-turn and one-leg-stand tests in 1981, finding that, combined, the tests can accurately determine whether a subject's BAC is .10 or higher eighty-three percent of the time.  *Horizontal Gaze Nystagmus: The Science and the Law.*  Those tests are now the standard field sobriety tests in use across the country.

¶ 25     In Colorado, "virtually every judge now takes judicial notice of the scientific principles underlying HGN testing," though Colorado's appellate courts haven't yet addressed the test's admissibility.  *Colorado DUI Benchbook* § 6.2.2.

## b. *Shreck*

¶ 26    In *Shreck,* the Colorado Supreme Court adopted a "liberal," "totality of the circumstances" test, grounded in relevant rules of evidence, for determining whether scientific evidence is admissible through expert testimony.  To get there, the court first rejected the so-called *Frye* test (derived from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)), which Colorado appellate courts had applied, albeit perhaps inconsistently, for several decades.  The *Frye* test requires that a scientific conclusion gain "general acceptance in the particular field to which it belongs" as to both the underlying theory supporting the conclusion and the techniques and experiments employing it, before evidence based on that conclusion can be introduced in court.  *Shreck*, 22 P.3d at 73 (quoting *Frye*, 293 F. at 1014).  The court determined that the *Frye* test is too rigid and is inconsistent with the more flexible approach countenanced by the Colorado Rules of Evidence.  *Id.* at 76-77.

¶ 27    The *Shreck* court also discussed the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which likewise rejected *Frye*, holding that its "rigid general acceptance requirement [is] at odds with the 'liberal

16

thrust' of the Federal Rules [of Evidence] and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Id.* at 588 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). Rather than adopting the *Daubert* approach wholesale, however, the Colorado Supreme Court went its own way.

¶ 28    Ultimately, the court adopted a rubric supported by CRE 403 and 702 "because their flexibility is consistent with a liberal approach that considers a wide range of issues." *Shreck*, 22 P.3d at 77. An admissibility analysis under *Shreck* requires the court to determine whether "(1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be helpful to the jury; and (4) the evidence satisfies CRE 403." *Rector*, 248 P.3d at 1200; *see Shreck*, 22 P.3d at 77-79. In making these determinations, the court can consider a broad range of indicia "that may be pertinent to the evidence at issue." *Shreck*, 22 P.3d at 77. These may include, but certainly aren't limited to, the factors identified in *Daubert*. *Id.* at 77-78.

¶ 29    Before applying the *Shreck* framework to the testimony at issue in this case, we pause to address Marston's assertion that

17

*Shreck* "is widely regarded as imposing a more rigorous 'gatekeeper' function on trial courts than *Frye* did."  (The point matters because, as discussed below, some courts have applied the *Frye* test in determining HGN test admissibility, and so understanding the relative restrictiveness of the tests will prove informative.)  To the extent Marston intends to suggest that the *Shreck* test is more limiting than the *Frye* test, he is wrong, for at least two reasons.

¶ 30     First, Marston's assertion is based on a quote from an Alaska Supreme Court case, *State v. Coon*, 974 P.2d 386, 390 (Alaska 1999), *abrogated by State v. Sharpe*, 435 P.3d 887 (Alaska 2019), that is taken out of context.  That case compared the *Daubert* test (not the *Shreck* test, which the Colorado Supreme Court adopted two years later) to the *Frye* test.  And in saying that the *Daubert* test imposes a more rigorous gatekeeper function, the Alaska court merely observed that, under *Daubert*, admissibility depends on consideration of several factors, while *Frye* gives dispositive weight to but one — general acceptance.

¶ 31     Second, *Shreck* itself repeatedly contrasts *Frye*'s "rigid" (indeed, too rigid) approach to the more "liberal" approach contemplated by the Colorado Rules of Evidence.  *See Shreck*, 22

18

P.3d at 76 (rejecting *Frye* because it "restricts the admissibility of reliable evidence that may not yet qualify as 'generally accepted'") (citation omitted).[3]  And the court emphasized that "[a]ny concerns that invalid scientific assertions will be admitted under this liberal standard are assuaged by Rule 702's overarching mandate of reliability and relevance. . . .  Such concerns are also mitigated by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"  *Id.* at 78 (quoting *Daubert*, 509 U.S. at 596).

c.    Application

i.    HGN Test Evidence is Generally Admissible

¶ 32    A number of relevant considerations identified in *Shreck* support the admissibility of HGN test results as evidence of impairment:

> 1. The technique has been tested and subjected to peer
>    review and publication.  *See State v. Ruthardt*, 680 A.2d

---

[3] Indeed, the court in *Shreck* concluded that certain scientific evidence that may not have been generally accepted was nonetheless admissible.  *People v. Shreck*, 22 P.3d 68, 80-81 (Colo. 2001).

349, 357 (Del. Super. Ct. 1996) (citing some of the relevant literature); *State v. Dahood*, 814 A.2d 159, 166 (N.H. 2002) (recognizing "extensive scientific literature dating back to the 1950s that thoroughly examines and critiques the HGN test and the theory underlying that test-that there is a strong correlation between the amount of alcohol a person consumes and the onset of nystagmus"); *see, e.g.*, Marcelline Burns & Ellen W. Anderson, Nat'l Highway Traffic Safety Admin., *A Colorado Validation Study of the Standardized Field Sobriety Test (SFST) Battery* (Nov. 1995), https://perma.cc/5MMA-NR8W; Gregory W. Good & Arol R. Augsburger, *Use of Horizontal Gaze Nystagmus as a Part of Roadside Sobriety Testing*, 63 Am. J. Optometry & Physiological Optics 467 (1986); V. Tharp, M. Burns & H. Moskowitz, Nat'l Highway Traffic Safety Admin., *Development and Field Test of Psychophysical Tests for DWI Arrest* (Mar. 1981), https://perma.cc/5HA3-S3KV.

2. Studies have produced reliability rates indicating a significant correlation between test results and

impairment. *See, e.g., Horizontal Gaze Nystagmus: The Science and the Law* (combined, the HGN test, the walk-and-turn test, and the one-leg-stand test accurately determine whether a subject's BAC was .10 or higher eighty-three percent of the time); Jack Stuster & Marcelline Burns, *Validation of the Standardized Field Sobriety Test Battery at BACs Below .10 Percent* (Aug. 1998), https://perma.cc/E5BL-PGFH (study showed that the HGN test could often accurately predict whether a subject's BAC is at or above 0.08).

3. Standards have been developed to ensure consistency in the application of the test and the assessment of responses. *See DWI Detection and Standardized Field Sobriety Test (SFST) Participant Manual* at Session 4, page 35 of 36, Session 7, pages 8-11 of 39 (providing instructions for application and evaluation of the HGN test nationwide).

4. There is substantial specialized literature dealing with the technique. *See Dahood*, 814 A.2d at 166 (reviewing some of the literature); *see, e.g.*, Stephanie E. Busloff,

Comment, *Can Your Eyes Be Used Against You — The Use of the Horizontal Gaze Nystagmus Test in the Courtroom*, 84 J. Crim. L. & Criminology 203 (Spring 1993).

5. The evidence has been offered in many other cases in Colorado as evidence of alcohol impairment. *See, e.g.*, *Campbell*, ¶¶ 7, 13-15 (HGN test results admitted at trial); *People v. Haack*, 2019 CO 52, ¶¶ 1, 8 (trial court found that HGN test results would have been admissible but for an unrelated constitutional violation).[4]

*See Shreck*, 22 P.3d at 77-78 (identifying these considerations as relevant).

¶ 33     As well, a survey of case law from other jurisdictions shows that most allow evidence of HGN test results as evidence of impairment. Some of these decisions employ a *Daubert-* or *Shreck*-like analysis, but some employ the even more restrictive

---

[4] As noted above, the prosecution cited several trial court decisions admitting evidence of HGN test results in responding to Marston's motion for a *Shreck* hearing. Marston has never disputed the point that Colorado trial courts regularly admit such evidence.

*Frye* test.  *See, e.g., Ballard v. State*, 955 P.2d 931, 940 (Alaska Ct. App. 1998) (HGN evidence meets *Frye* test if results are offered to show a person has consumed alcohol and is potentially impaired), *overruled on other grounds as recognized by Alvarez v. State*, 249 P.3d 286 (Alaska 2011); *State ex rel. Hamilton v. City Ct.*, 799 P.2d 855, 859 (Ariz. 1990) (HGN test satisfies the *Frye* standard if offered only as evidence of impairment); *State v. Commins*, 850 A.2d 1074, 1080-81 (Conn. App. Ct. 2004) (HGN test evidence satisfied *Daubert* test), *aff'd on other grounds*, 886 A.2d 824 (Conn. 2005); *Ruthardt*, 680 A.2d at 356-60 (applying *Shreck*-like test; HGN test results admissible as evidence of impairment); *Williams v. State*, 710 So. 2d 24, 30-32 (Fla. Dist. Ct. App. 1998) (the HGN test is a reliable indicator of the presence of alcohol in blood, and there is no need for trial courts to reapply a *Frye* analysis to HGN); *Hawkins v. State*, 476 S.E.2d 803, 806-08 (Ga. Ct. App. 1996) (HGN test results admissible without expert testimony regarding the scientific validity of the test; applying a *Shreck*-like totality of the circumstances test); *State v. Gleason*, 844 P.2d 691, 694-95 (Idaho 1992) (HGN testimony admissible under *Frye* test as evidence of impairment); *State v. Taylor*, 694 A.2d 907, 911-12 (Me. 1997) (applying *Frye*

test; HGN test results admissible as evidence of impairment); *Schultz v. State*, 664 A.2d 60, 69-70 (Md. Ct. Spec. App. 1995) (courts may take judicial notice of the results of an HGN test); *State v. Klawitter,* 518 N.W.2d 577, 584-86 (Minn. 1994) (HGN test results satisfied *Frye* test); *State v. Hill*, 865 S.W.2d 702, 703-04 (Mo. Ct. App. 1993) (HGN test satisfies *Frye* test if offered as evidence of intoxication), *overruled on other grounds by State v. Carson*, 941 S.W.2d 518 (Mo. 1997); *Baue*, 607 N.W.2d at 201-04 (HGN test results admissible as evidence of impairment under *Frye* test); *Dahood*, 814 A.2d at 166-67 (HGN test results admissible under *Daubert* test); *State v. Aleman*, 194 P.3d 110, 115-16 (N.M. Ct. App. 2008) (HGN test results admissible under *Daubert* test); *City of Fargo v. McLaughlin*, 512 N.W.2d 700, 703-08 (N.D. 1994) (HGN test results admissible under *Frye* test if offered in conjunction with other field sobriety tests); *State v. O'Key*, 899 P.2d 663, 689 (Or. 1995) (HGN test results admissible under *Daubert* test); *Emerson v. State*, 880 S.W.2d 759, 763-69 (Tex. Crim. App. 1994) (HGN test results admissible under Texas Rule of Criminal Evidence 702; applying *Daubert*-like test); *see also United States v. Horn*, 185 F. Supp. 2d 530, 561 (D. Md. 2002) (collecting cases).

¶ 34    Marston cites a few cases rejecting the admissibility of HGN test results under the facts before them.  *Ex parte Malone*, 575 So. 2d 106 (Ala. 1990); *State v. Meador*, 674 So. 2d 826 (Fla. Dist. Ct. App. 1996); *People v. McKown*, 875 N.E.2d 1029 (Ill. 2007); *State v. Witte*, 836 P.2d 1110 (Kan. 1992); *State v. Lasworth*, 42 P.3d 844 (N.M. Ct. App. 2001); *Commonwealth v. Apollo*, 603 A.2d 1023 (Pa. Super. Ct. 1992).[5]  But those cases usually apply the *Frye* test, which, as discussed above, is more restrictive than the "liberal" *Shreck* test.  And even then, they don't reject such evidence outright, but hold that the evidence before them wasn't sufficient to establish reliability and leave open the possibility that such evidence could be presented.  *See also Commonwealth v. Sands*, 675 N.E.2d 370, 371-73 (Mass. 1997) (trial court erred by allowing officer to testify about HGN test results without being qualified as an expert, but indicating that HGN test results would be admissible if supported by expert testimony from the person administering the

---

[5] Marston also cites *State v. Superior Court*, 718 P.2d 171 (Ariz. 1986), in support of his position.  But the court in that case actually held that HGN test results are admissible as evidence of impairment (but not as evidence of a specific BAC level).  *Id.* at 182.

25

test); *State v. Helms*, 504 S.E.2d 293, 294-96 (N.C. 1998) (same); *State v. Murphy*, 953 S.W.2d 200, 202-03 (Tenn. 1997) (same); *State v. Cissne*, 865 P.2d 564, 566-69 (Wash. Ct. App. 1994) (same).[6]

¶ 35    The weight of judicial authority therefore favors admissibility of HGN test results without the need for additional evidence of scientific reliability — at least if the evidence is offered only as evidence of impairment and not a specific BAC level.[7]

¶ 36    We recognize that there isn't unanimous agreement among academics and other commentators concerning the reliability of the HGN test.  But much of the disagreement doesn't relate to whether alcohol can cause nystagmus — that point is widely accepted.  Rather, some have noted that there can be reasons other than

---

[6] In at least one instance, the court reversed course after additional evidence of reliability was presented.  *State v. Aleman*, 194 P.3d 110, 115-16 (N.M. Ct. App. 2008) (backtracking on its earlier holding in *State v. Lasworth*, 42 P.3d 844 (N.M. Ct. App. 2001)).

[7] A few courts have held that this type of evidence isn't scientific evidence at all, and therefore isn't subject to restrictions on scientific evidence.  *State v. Murphy*, 451 N.W.2d 154, 156-58 (Iowa 1990); *State v. Nagel*, 506 N.E.2d 285, 286 (Ohio Ct. App. 1986); *Salt Lake City v. Garcia*, 912 P.2d 997, 1000-01 (Utah Ct. App. 1996).  We align ourselves, however, with the vast majority of courts that have held that such evidence is based, at least in part, on scientific principles.

alcohol impairment that may explain test results in a particular case, *see, e.g.*, William A. Pangman, *Horizontal Gaze Nystagmus: Voodoo Science*, 2 DWI J. 1, 2 (1987), or that police officers may not be sufficiently trained in administering the test. And some claim a higher incidence of false positives than reported by NHTSA and other studies. Busloff, 84 J. Crim. L. & Criminology at 211 (noting that NHTSA's "experimental procedure has been further challenged for its intentional screening out of those individuals highly likely to be misclassified as false positives"). We believe such concerns go to the weight of the evidence, not its admissibility. *See Ruthardt*, 680 A.2d at 359-60 (so holding); *Dahood*, 814 A.2d at 166-67 (same). They can be addressed through the presentation of evidence by the defense, cross-examination, and rigorous application of the rules governing an expert's qualifications. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Shreck*, 22 P.3d at 78 (same).

¶ 37    We therefore conclude that evidence of HGN test results is admissible as evidence of impairment if offered through a qualified

expert witness. Contrary to Marston's assertion, such an expert doesn't have to be an expert in the science underlying the test. It is enough that the witness is an expert in administering the test and interpreting the subject's responses. *See, e.g.*, *Ballard*, 955 P.2d at 942 (trooper could testify about the results of the HGN test because the court could find he was qualified to administer the test and assess the results); *People v. Leahy*, 882 P.2d 321, 336 (Cal. 1994) (once HGN testing is shown to be generally accepted, officers may be deemed qualified to testify as to test results and the prosecution won't be required to submit expert testimony confirming a police officer's evaluation of an HGN test); *Taylor*, 694 A.2d at 912 ("A proper foundation shall consist of evidence that the officer or administrator of the HGN test is trained in the procedure and the test was properly administered."); *State v. Torres*, 976 P.2d 20, 34-35 (N.M. 1999) (the expert is qualified to testify if it is shown that he had ability and training to administer the HGN test properly, and that he did in fact administer the test properly); *see also Campbell*, ¶¶ 26-31 (officer testifying as to HGN test results must be qualified as an expert in administration and interpretation of the test).

¶ 38 Though a party may request a *Shreck* hearing on the admissibility of the proposed testimony, a trial court isn't required to grant that request if it has "sufficient information to make specific findings under CRE 403 and CRE 702 about the reliability of the scientific principles involved, the expert's qualification to testify to such matters, the helpfulness to the jury, and potential prejudice." *Rector*, 248 P.3d at 1201. The district court in this case had ample information before it from which it could determine the admissibility of the HGN test results without granting Marston's request for a *Shreck* hearing. And Deputy Kehl was sufficiently qualified to testify about the administration and interpretation of the test. (Marston doesn't contest this point.) Though the court didn't make extensive findings, it didn't abuse its discretion.

ii. Alternatively, Any Error Was Harmless

¶ 39 Even if the district court did err, we agree with the People that any error was harmless.

¶ 40 In *Campbell*, the supreme court determined that while the district court erred by allowing a police officer to testify about the results of an HGN test without being qualified as an expert, the error was harmless. *Campbell*, ¶¶ 1-2, 35. The court discussed the

29

"overwhelming" evidence against Campbell aside from the HGN test, including the following:

- "Campbell's breath had an odor of alcohol."

- "[H]is eyes were bloodshot."

- "[H]is speech was slurred."

- He was uncoordinated: "he dropped his wallet while trying to retrieve his identification," and, "when Campbell tried to get out of his truck, the officer saw him reach for the door handle twice without success before grabbing it and opening the door."

- Bottles of alcohol were found in his car.

- He failed two of the other field sobriety tests.

- He had admitted to consuming alcohol.

- He took two breath tests, which showed BAC levels of 0.07 and 0.086, respectively.

*Id.* at ¶¶ 36-40.

¶ 41    There is similar overwhelming evidence against Marston:

- Two of the three officers reported that Marston's breath smelled like alcohol.

30

- All three observed that he had bloodshot eyes.

- Two of the three noticed that his speech was slurred.

- Marston had trouble keeping his balance as he walked out of the 7-Eleven into the parking lot, and two of the three officers reported that he had to reach to keep his balance.

- Bottles of alcohol were found in the truck.

- Marston didn't complete the other two field sobriety tests as a sober person would. Deputy Kehl observed three of eight clues on the walk-and-turn test. On the one-leg-stand test, Marston could only lift his leg for approximately four seconds.

- Marston admitted to drinking alcohol the night before.

¶ 42    Unlike Campbell, Marston didn't submit to a breath test. (Nor did he submit to a blood test.) But a witness saw him driving erratically and nodding off at the wheel. And Marston said, "I couldn't do that sober," when Deputy Kehl demonstrated the walk-and-turn maneuver.

¶ 43    Because of the overwhelming amount of evidence against Marston independent of the HGN test results, we conclude that any

error in allowing Deputy Kehl to testify about those results without first holding a *Shreck* hearing didn't substantially influence the verdict or impair the fairness of the trial. *See Hagos*, ¶ 12; *Wilson*, ¶ 24.

### III. Conclusion

¶ 44 The judgment is reversed, and the case is remanded for proceedings consistent with this opinion.

JUDGE WELLING and JUDGE GOMEZ concur.